# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| ROBERT J. STENGL, DANIEL WILL, RONALD F. KOSEWICZ, GARY K. COLLEY, LESLIE D. DIAZ, AMAYA JOHNSON, WILLIAM A. MCKINLEY and JOHN KARIPAS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) **CLASS ACTION COMPLAINT** ) |
| Plaintiffs, | ) ) |
| v. | ) **CASE NO:** ) |
| L3HARRIS TECHNOLOGIES, INC., THE BOARD OF DIRECTORS OF L3HARRIS TECHNOLOGIES, INC., THE INVESTMENT COMMITTEE OF L3HARRIS TECHNOLOGIES, INC. and JOHN DOES 1-30. | ) ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Robert J. Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley and John Karipas ("Plaintiffs"), by and through their attorneys, on behalf of the L3Harris Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. In addition, prior to 2020 the Plan was known as the L3 Technologies Master Savings Plan and prior to 2015 it was known as the L-3 Communications Master Savings Plan Trust and all three plans will be referred to collectively as the "Plan."

1

Plan's fiduciaries, which include L3Harris Technologies, Inc.[2] ("L3Harris" or the "Company"),
the Board of Directors of L3Harris Technologies, Inc.,[3] ("Board") and the Investment Committee
of L3Harris Technologies, Inc. and its members during the Class Period[4] ("Committee") for
breaches of their fiduciary duties.

2.      Prior to initiating this action, Plaintiffs exhausted their administrative remedies.
*See Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223-25 (11th Cir. 2008).

3.      Defendant L3Harris provides the following procedure in order to file claims for
benefits:

> If any Participant, distributee or other person believes he or she is entitled to
> benefits in an amount greater than those which he or she is receiving or has
> received, he or she (or his or her duly authorized representative) may file a claim
> with the Administrative Committee. Such a claim shall be in writing and state the
> nature of the claim, the facts supporting the claim, the amount claimed and the
> address of the claimant. The Administrative Committee shall review the claim
> and, unless special circumstances require an extension of time, within 90 days
> after receipt of the claim give written or electronic notice to the claimant of its
> decision with respect to the claim. If special circumstances require an extension
> of time, the claimant shall be so advised in writing or by electronic means within
> the initial 90- day period and in no event shall such an extension exceed 90 days.
> The extension notice shall indicate the special circumstances requiring an
> extension of time and the date by which the Administrative Committee expects

---

[2] Pursuant to a 2018 Plan of Merger, L3Harris Technologies, Inc. became the surviving corporation to L3 Technologies, Inc. In 2015, L3 Technologies, Inc. was known as the L-3 Communications Corporation. All three corporations will be referred to collectively as "L3Harris" or the "Company."

[3] Pursuant to a 2018 Plan of Merger, the Board of Directors of L3Harris Technologies, Inc. became the surviving board of directors of the Board of Directors of L3 Technologies, Inc. In 2015, the Board of Directors of L3 Technologies, Inc. was known as the Board of Directors of L-3 Communications Corporation. All three boards will be referred to collectively as the "Board."

[4] Class Period is defined below as November 23, 2015 through the date of judgment. Pursuant to a 2018 Plan of Merger, the Investment Committee of L3Harris Technologies, Inc. became the surviving committee to the Investment Committee of L3 Technologies, Inc. or similar name. In 2015, the Investment Committee of L3 Technologies, Inc. was known as the Investment Committee of L-3 Communications Corporation or a similar name. All three Committees will be referred to collectively as the "Committee."

to render a decision. The notice of the decision of the Administrative Committee with respect to the claim shall be written in a manner calculated to be understood by the claimant and, if the claim is wholly or partially denied, shall set forth the specific reasons for the denial, specific references to the pertinent Plan provisions on which the denial is based, a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary, and an explanation of the claim review procedure under the Plan and the time limits applicable to such procedure (including a statement of the claimant's right to bring a civil action under section 502(a) of ERISA following the final denial of a claim).

The L3Harris Retirement Savings Plan as Amended and Restated Effective January 1, 2021. ("Plan Doc.") at 85.

4.     On November 22, 2021, Plaintiffs sent an Administrative Demand to the Plan Administrator via FedEx Priority Overnight.  *See* Exhibit A (administrative demand without exhibits).

5.     The Administrative Demand detailed Plaintiffs' claims and enclosed a copy of a Complaint identical to the instant one in all material aspects.

6.     On November 23, 2021, Plaintiffs received confirmation that the Administrative Demand was delivered on that day at 11:21 a.m. and signed for by B. Vargo. *See* Exhibit B.

7.     In response, by email dated March 3, 2022, Counsel for the Defendants confirmed that Plaintiffs can now be considered to have exhausted all administrative remedies.

## II.     INTRODUCTION

8.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003); *Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).

9.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

10.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

11.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

12.    Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

---

[5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource- center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

13.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

14.     Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

15.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their defined contribution plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

16.     At all times during the Class Period (November 23, 2015 through the date of judgment) the Plan had at least $4.5 billion dollars in assets under management.  At the end of 2019, the Plan had over $13.5 billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2019 Report of Independent Auditor of the L3 Harris Retirement Savings Plan ("2019 Auditor Report") at 2.

17.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

18.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2)  maintaining certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping costs.

19.     Because "the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately."  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

20.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

21.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

### III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332€(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

23.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

24.    Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.    PARTIES

**Plaintiffs**

25.    Plaintiff Robert J. Stengl ("Stengl") resides in Cascade, Colorado.  During his employment, Plaintiff Stengl participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit, including the Fidelity Freedom 2020 K target date fund. In addition, Plaintiff Stengl was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

26.    Plaintiff Daniel Will ("Will") resides in West Chester, Pennsylvania.  During his employment, Plaintiff Will participated in the Plan, investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

27.    Plaintiff Ronald F. Kosewicz ("Kosewicz") resides in Little Rock, Arkansas. During his employment, Plaintiff Kosewicz participated in the Plan, investing in the options

offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

28.     Plaintiff Gary K. Colley ("Colley") resides in Harriman, Tennessee.  During his employment, Plaintiff Colley participated in the Plan, investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

29.     Plaintiff Leslie D. Diaz ("Diaz") resides in North Andover, Massachusetts.  During her employment, Plaintiff Diaz participated in the Plan, investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

30.     Plaintiff Amaya Johnson ("Johnson") resides in Reno, Nevada.  During her employment, Plaintiff Johnson participated in the Plan, investing in the options offered by the Plan and which are the subject of this lawsuit, including the Fidelity Freedom K 2050 target date fund.  In addition, Plaintiff Johnson was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

31.     Plaintiff William A. McKinley ("McKinley") resides in Roseville, California.  During his employment, Plaintiff McKinley participated in the Plan, investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

32.     Plaintiff John Karipas ("Karipas") resides in Commack, New York.  During his employment, Plaintiff Karipas participated in the Plan, investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

33.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

34.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

35.     L3Harris is the Plan sponsor and a named fiduciary. 2019 Form 5500 of the L3 Harris Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.  Its corporate headquarters is located at 1025 West NASA Boulevard, Mail Stop C41I, Melbourne, Florida. L3Harris describes itself as "an agile global aerospace and defense technology innovator, delivering end-to-end solutions that meet customers' mission-critical needs.   The company provides advanced defense and commercial technologies across air, land, sea, space and cyber domains. L3Harris has approximately $18 billion in annual revenue and 48,000 employees, with customers in more than 100 countries." 2020 Annual Report of L3Harris Technologies, Inc. at ii., available at https://www.l3harris.com /sites/default/files /2021-03/ L3Harris_2020_ Annual Report.pdf (last accessed on November 4, 2021).

36.     L3Harris, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. The Investment Policy Statement of L3 Harris Technologies Retirement Savings Plan Master Trust ("IPS") at 2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

37.     Accordingly, L3Harris during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

38.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

39.      L3Harris, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. IPS at 2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

40.     Accordingly, the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

41.     For the foregoing reasons, the Board is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

42.     The Board and members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

43.     As discussed above, the Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 2. However, as described in more detail below, the Committee failed to prudently carry out its fiduciary duties. As described in the IPS, the Committee has the responsibility to "[e]stablish, and modify, as appropriate, the investment policies for the Plan and the investment objectives and performance goals for the management of Plan investment options, and monitor the performance of investment options against performance criteria …" IPS at 3. In addition, the Committee must: "Select, evaluate, retain, terminate and approve the fees and other retention terms of investment consultants, or other legal, finance or other experts or advisors, including approving, entering into or amending the terms of the related service agreement …" *Id.* Further, the Committee must "[e]stablish, suspend, terminate or modify separate investment options and allocate assets into appropriate options of the Plan …" *Id.* As will be discussed in detail below, the Committee fell well short of these fiduciary goals.

44.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

45.     The Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

11

46.     To the extent that there are additional officers and employees of L3Harris who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, L3Harris officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## V.     THE PLAN

47.     As described in the 2019 report of the Independent Auditor: "[t]he Plan is a defined contribution plan with a 401(k) feature covering eligible employees of L3Harris Technologies, Inc. ('L3Harris') and certain of its subsidiaries …" 2019 Auditor Report at 4.

48.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  The L3Harris Retirement Savings Plan as Amended and Restated Effective January 1, 2021. ("Plan Doc.") at 45. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

***Eligibility***

49.     In general, the Plan covers all "eligible employees of L3Harris Technologies, Inc. ('L3Harris') and certain of its subsidiaries…" 2019 Auditor Report at 4.

***Contributions and Vesting***

50.     There are several types of contributions that can be added to a participant's account, including, but not limited to, an employee salary deferral contribution, an employer matching contribution and employer nonelective contributions. *Id.*  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id.*

51.     Employees may "contribute a percentage of eligible compensation, as defined in the Plan document and subject to Internal Revenue Code (the "Code") limitations, on a pre-tax and/or an after-tax basis." *Id.*

52.     With regard to contributions made by L3Harris: "[f]or any eligible employee who has completed one year of service with the Company, the Company matches up to 100% of pre-tax and after-tax contributions subject to a limit of 6% … of eligible compensation." *Id.*

53.     With regard to vesting of contributions made by L3Harris: "[u]pon retirement or other termination of employment, a participant may elect to receive either a lump-sum amount equal to all or a portion of the participant's vested account, or installments of his or her vested account over a future period." *Id.*

54.     Like other companies that sponsor defined contribution plans for their employees, L3Harris enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to defined contribution plans at the time when the contributions are made.  *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.     L3Harris also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with

unhappy or lower-performing workers." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.     Given the size of the Plan, L3Harris likely enjoyed a significant tax and cost savings from offering a match.

### The Plan's Investments

57.     Several investments were available to Plan participants for investment each year during the putative Class Period. As discussed above, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.

58.     The Plan's assets under management for all funds as of the end of 2019 was $13,582,463,721. 2019 Auditor Report at 3. From 2015 to 2019 the Plan's assets under management ranged from more than $4.5 billion dollars to $13.5 billion dollars.

### Plan Expenses

59.     As detailed in the 2019 Auditor Report, "all reasonable charges and expenses incurred in connection with the administration of the Plan are paid by the Trustee from the assets of the trust." 2019 Auditor Report at 7.

## VI.    CLASS ACTION ALLEGATIONS

60.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 23, 2015 through the date of judgment (the "Class Period").

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

61.    The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 filed with the Dept. of Labor lists 76,208 Plan "participants with account balances as of the end of the plan year."  The 2019 Form 5500 filing of the L3 Harris Retirement Savings Plan filed with the United States Department of Labor ("2019 5500") at 2.

62.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

63.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.    Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

64.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

65.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

66.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

67.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

68.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

69.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

70.     In fact, in an attempt to discover the details of the Plans' mismanagement, on February 25, 2021, the Plaintiffs wrote to L3Harris requesting, *inter alia*, meeting minutes of the Committee during the Class Period. By Letter dated March 17, 2021, L3Harris denied Plaintiffs' request for these meeting minutes.

71.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

72.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

17

73.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds and high recordkeeping and administration fees throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**A.     The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**(1)     Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

74.      One indication of the Plan's poor management was the fiduciaries' selection of expensive funds for the Plan.   This is apparent when viewed through the lens of several benchmarks.

75.     As a starting point, investment options have a fee for investment management and other services.   With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio.   For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return which reduces the likelihood that that plan participants will achieve their desired lifestyle in retirement.   This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

76.     Vanguard's white paper on investment management fees, "Vanguard's Principles for Investing Success," discusses the importance of minimizing costs.   Importantly, "[m]arkets are unpredictable.   Costs are forever."   *Id.* at 17.   Vanguard lays out four bullet points all investors must keep in mind: higher costs can significantly depress a portfolio's growth over long periods; costs create an inevitable gap between what the markets return and what investors actually earn – but keeping expenses down can help narrow that gap; lower-cost mutual funds have tended to

perform better than higher-cost funds over time; and indexed investments can be a useful tool for cost control. *Id.*

77.     Taking one year of the Class Period as an example, in 2019, the expense ratios for several funds in the Plan were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets).  The majority of funds in the Plan had expense ratios well above the median and average expense ratios for similarly sized plans.

78.     In some cases, expense ratios were up to ***71%*** (in the case of the Fidelity Balanced K) and a ***60%*** difference (in the case of the Fidelity Freedom 2060 K Fund) above the median expense ratios in the same category. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the chart below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Median[7]** |
| Fid Fr 2015 K | 0.50 % | Target-date | 0.40% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.40% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.40% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.40% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.40% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.40% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.31% |
| T. Rowe SC Stk I | 0.59% | Domestic Equity | 0.31% |
| Dodge & Cox Stock | 0.59% | Domestic Equity | 0.31% |
| Am Growth Fd Am R6 | 0.59% | Domestic Equity | 0.31% |

[7] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf ("ICI Study") at 66.

| ICI Median Chart | | | |
|---|---|---|---|
| Current Fund | 2021 Exp Ratio | Investment Style | ICI Median[7] |
| Fidelity Balanced K | 0.59% | Non Target-date Balanced | 0.17% |
| Fidelity Div Intl K | 0.59% | International Equity | 0.49% |
| Fidelity Div Intl K6 | 0.59% | International Equity | 0.49% |
| Dodge & Cox Inc | 0.59% | Domestic Bonds | 0.37% |
| Fid Fr K Inc | 0.42 % | Target-date | 0.40% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.40% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.40% |

79.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| Current Fund | 2021 Exp Ratio | Investment Style | ICI Average[8] |
| Fid Fr 2015 K | 0.50 % | Target-date | 0.41% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.41% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.41% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.41% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.41% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.41% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.37% |
| T. Rowe SC Stk I | 0.59 % | Domestic Equity | 0.37% |
| Dodge & Cox Stock | 0.59 % | Domestic Equity | 0.37% |
| Am Growth Fd Am R6 | 0.59 % | Domestic Equity | 0.37% |
| Fidelity Balanced K | 0.59% | Non Target-date Balanced | 0.30% |
| Fidelity Div Intl K | 0.59% | International Equity | 0.47% |

[8] ICI Study at 59.

20

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2021 Exp Ratio** | **Investment Style** | **ICI Average[8]** |
| Fidelity Div Intl K6 | 0.59% | International Equity | 0.47% |
| Dodge & Cox Inc | 0.59% | Domestic Bonds | 0.32% |
| Fid Fr K Inc | 0.42 % | Target-date | 0.41% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.41% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.41% |

80.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median and average fees are based on a study conducted in 2018 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans over $1 billion dollars in assets was 0.52% using 2015 data compared with 0.37% in 2018.  Accordingly, the median and average expense ratios in 2021 would be lower than indicated above, demonstrating a greater disparity between the 2021 expense ratios utilized in the above charts for the Plan's funds and the median and average expense ratios in the same category.

81.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

**(2)     Several of the Plan's Funds With Substantial Assets Were Not in the Lowest Fee Share Class Available to the Plan**

82.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

83.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the

funds hold identical investments and have the same manager. Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

84.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan. *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

85.     The total assets under management for all of these funds was over $1.1 billion dollars from 2017 to 2019 thus easily qualifying them for lower share classes. The following chart provides detail on these funds:

| Fund in the Plan | ER | Less Expensive Share Class | Lower Cost ER | Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom K | 0.42% | Fidelity Freedom K6 | 0.37% | 13.51% |
| Fidelity Freedom 2005 K | 0.42% | Fidelity Freedom 2005 K6 | 0.37% | 13.51% |
| Fidelity Freedom 2010 K | 0.46% | Fidelity Freedom 2010 K6 | 0.39% | 17.95% |
| Fidelity Freedom 2015 K | 0.49% | Fidelity Freedom 2015 K6 | 0.41% | 19.51% |
| Fidelity Freedom 2020 K | 0.53% | Fidelity Freedom 2020 K6 | 0.43% | 23.26% |
| Fidelity Freedom 2025 K | 0.56% | Fidelity Freedom 2025 K6 | 0.45% | 24.44% |
| Fidelity Freedom 2030 K | 0.60% | Fidelity Freedom 2030 K6 | 0.47% | 27.66% |
| Fidelity Freedom 2035 K | 0.63% | Fidelity Freedom 2035 K6 | 0.49% | 28.57% |
| Fidelity Freedom 2040 K | 0.65% | Fidelity Freedom 2040 K6 | 0.50% | 30.00% |

| Fund in the Plan | ER | Less Expensive Share Class | Lower Cost ER | Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2045 K | 0.65% | Fidelity Freedom 2045 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2050 K | 0.65% | Fidelity Freedom 2050 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2055 K | 0.65% | Fidelity Freedom 2055 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2060 K | 0.65% | Fidelity Freedom 2060 K6 | 0.50% | 30.00% |

86.     At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

87.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds **could not have** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, or (4) greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

88.     Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

89.     Simply put, a fiduciary to a jumbo defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.

90.     Here, had the Plan's fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plan's investment offerings and monitoring investment

performance, the Plan would have moved to the identical lower cost share class of the identical fund. Plan Doc. at 71.

**(3)     Failure to Investigate Availability of Lower Cost Collective Trusts**

91.     Additional evidence of the Defendants' flawed process in selecting and monitoring funds for the Plan is evidenced by the lack of collective trusts as investment options. Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

92.     ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

93.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

94.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the

Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much less, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

95.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[9]

96.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified that the Fidelity Diversified International Fund and the Fidelity Magellan funds, which harbored more than $300 million dollars in assets under management as of 2019, were available as CITs. The chart below compares the cost differences between the mutual fund and CIT versions.

---

[9] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

| Fund in the Plan | 2021 ER | CIT Version | 2021 ER |
|---|---|---|---|
| Fidelity Diversified International Fund K[10] | 0.69% | Fidelity Diversified International Fund CIT | 0.58% |
| Fidelity Magellan K | 0.68% | Fidelity Magellan CIT | 0.43% |

97.     Accordingly, collective trusts were readily available to the Plan during the Class Period, which Defendants knew or should have known of their existence, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

98.     The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts, but Defendants again failed to investigate this option adequately.

99.     In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

**(4)     Defendants Failed to Utilize the Tools of Modern Portfolio Theory in Selecting the Best Investments for the Plan**

100.     Because a fiduciary must have the best interests of participants in mind, performance is defined, not just on an actual return basis, but quantified on an absolute and relative volatility basis which considers returns on a risk adjusted basis.  Fiduciaries utilize Modern Portfolio Theory (MPT) to make such assessments and the Committee utterly failed to select

---

[10] Although the Plan did switch to the K6 version of this fund in 2018, the change was too little to late as the damages had already been baked in. In addition, the CIT version would have had a lower expense ratio than the K6 version by two basis points.

prudent investments for the Plan based on several criteria under the MPT.

101.    Modern trust law and those who have a legal fiduciary duty to choose and review investments on behalf of others, apply the tools of Modern Portfolio Theory in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."). *See Birse v. CenturyLink, Inc.*,2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

102.    Some of the metrics used to evaluate investments under the Modern Portfolio Theory are as follows:

- Returns - Absolute, relative to its peers, and against its respective benchmark.

- Beta - A measure of a fund's sensitivity to market movements.

- Standard Deviation - This statistical measurement of dispersion about an average, depicts how widely a mutual fund's returns varied over a certain period of time. Investors use the standard deviation of historical performance to try to predict the range of returns that are most likely for a given fund. When a fund has a high standard deviation, the predicted range of performance is wide, implying greater volatility.

- R squared - R-squared measures the relationship between a portfolio and its benchmark. It is simply a measure of the correlation of the portfolio's returns to the benchmark's returns

- Sharpe Ratio - It is calculated by using standard deviation and excess return to determine reward per unit of risk.  The higher the Sharpe ratio, the better the fund's historical risk-adjusted performance.

- Upside/Downside Capture Ratio - Upside/downside capture ratio shows you

whether a given fund has outperformed--gained more or lost less than--a broad market benchmark during periods of market strength and weakness, and if so, by how much.

- Information Ratio - A ratio of portfolio returns in excess of the returns of a benchmark (usually an index) to the volatility of those returns. Similar to Sharpe Ratio.  The information ratio (IR) measures a portfolio manager's ability to generate excess returns relative to a benchmark, but also attempts to identify the consistency of the portfolio manager.[11]

103.    According to a recent article, among the top ten modern portfolio criteria used in selecting core fund line-ups are:[12]

- Performance v. benchmarks

- Total performance (5-yr return)

- Fee structure for plan

- Alpha, beta and standard deviations

- Upside/Downside capture ratio

- Sharpe ratio

104.    Prudent portfolio managers use MPT to identify funds that have a similar Risk/Return footprint to alternative, less expensive, better performing funds whether those alternative funds may be collective investment trusts, separate pooled accounts or alternative mutual funds. Here, the funds in the Plan remained largely unchanged since 2015, strongly suggesting that the Plan's fiduciaries failed to use MPT or any other acceptable alternative to evaluate and replace funds in the Plan.

105.    In particular, the Plan chose to stay with the Fidelity Freedom K line up of target date funds which ranged from an anticipated retirement date of 2025 to 2060. The Fidelity Freedom

---

[11] The definition of these terms are available at https://www.morningstar.com/InvGlossary

[12] *See* 2020 Planadviser Retirement Plan Adviser Survey, available at *https://www.planadviser.com/research/2020-planadviser-retirement-plan-adviser-survey/?pagesec=2*

K line up of target funds is analyzed in the chart below using a three-year history and MPT data from December 31, 2019. This data clearly shows that several better performing less expensive alternatives were available to the Plan but not chosen by the Plan's fiduciaries evidencing a lack of an acceptable prudent process in fund selection.

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| Fidelity Freedom K 2025 Fund | 9.59% | 1.03 | 97.51 | 1.10 | 7.13 | 0.69 | 105.28/100.19 |
| FIAM Blend Target Date 2025 Q | 9.68% | 1.03 | 98.57 | 1.12 | 7.10 | 1.01 | 105.81/100.11 |
| FIAM Blend Target Date 2025 S | 9.68% | 1.03 | 98.43 | 1.13 | 7.12 | 1.06 | 106.45/100.27 |
| Fidelity Freedom Index 2025 Investor Class | 9.58% | 1.01 | 99.28 | 1.13 | 6.93 | 1.32 | 103.54/96.03 |
| Fidelity Freedom Index 2025 Inst Premium Class | 9.63% | 1.00 | 99.37 | 1.14 | 6.93 | 1.51 | 104.00/96.38 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2025 TR USD | 8.80% | | | 1.03 | 6.87 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom K 2030 Fund | 10.78% | 1.04 | 97.69 | 1.07 | 8.46 | 0.92 | 108.12/102.33 |
| FIAM Blend Target Date 2030 Q | 10.89% | 1.05 | 98.61 | 1.09 | 8.44 | 1.25 | 108.76/102.37 |
| FIAM Blend Index Target Date 2030 S | 10.90% | 1.05 | 98.64 | 1.10 | 8.45 | 1.34 | 109.40/102.79 |
| Fidelity Freedom Index 2030 Investor Class | 10.85% | 1.03 | 99.32 | 1.10 | 8.27 | 1.79 | 107.09/99.13 |
| Fidelity Freedom Index 2030 Inst. Premium Class | 10.90% | 1.03 | 99.27 | 1.11 | 8.27 | 1.81 | 107.25/98.88 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2030 TR USD | 9.55% | | | 0.98 | 8.01 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom K 2035 Fund | **11.70%** | 1.10 | 98.09 | 1.00 | 10.03 | 0.88 | 111.47/108.60 |

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2035 Q | 11.91% | 1.11 | 98.97 | 1.01 | 10.06 | 1.19 | 113.00/109.59 |
| FIAM Blend Target Date 2035 S | 12.01% | 1.10 | 98.98 | 1.02 | 10.03 | 1.26 | 113.23/109.34 |
| Fidelity Freedom Index 2035 Investor Class | 11.92% | 1.09 | 99.63 | 1.04 | 9.86 | 1.69 | 111.53/106.26 |
| Fidelity Freedom Index 2035 Inst. Premium Class | 11.97% | 1.09 | 99.62 | 1.04 | 9.87 | 1.72 | 111.78/106.22 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2035 TR USD | 10.25% | | | 0.94 | 9.05 | | |

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| Fidelity Freedom K 2040 Fund | **11.85%** | 1.09 | 98.39 | 0.95 | 10.63 | 0.70 | 109.42/108.58 |
| FIAM Blend Target Date 2040 Q | 12.00% | 1.09 | 99.11 | 0.96 | 10.66 | 0.94 | 110.27/108.84 |
| FIAM Blend Target Date 2040 S | 12.20% | 1.09 | 99.05 | 0.98 | 10.64 | 1.01 | 110.55/108.31 |
| Fidelity Freedom Index 2040 Investor Class | 12.15% | 1.07 | 99.66 | 1.00 | 10.39 | 1.59 | 109.08/104.74 |
| Fidelity Freedom Index 2040 Inst. Premium Class | 12.18% | 1.07 | 99.64 | 1.01 | 10.38 | 1.62 | 108.96/104.19 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2040 TR USD | 10.73% | | | 0.93 | 9.72 | | |

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| Fidelity Freedom K 2045 Fund | 11.85% | 1.05 | 98.47 | 0.95 | 10.63 | 0.60 | 105.93/104.18 |
| FIAM Blend Target Date 2045 Q | 11.99% | 1.05 | 99.16 | 0.97 | 10.65 | 0.88 | 106.51/104.02 |
| FIAM Blend Target Date 2045 S | 12.22% | 1.05 | 99.17 | 0.98 | 10.65 | 0.99 | 107.05/104.01 |
| Fidelity Freedom Index 2045 Investor Class | 12.15% | 1.03 | 99.60 | 1.00 | 10.39 | 1.59 | 105.48/100.33 |
| Fidelity Freedom Index 2045 Inst. Premium Class | 12.17% | 1.03 | 99.61 | 1.01 | 10.38 | 1.65 | 105.42/99.92 |

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2045 TR USD | 11.01% | | | 0.92 | 10.08 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom K 2050 Fund | **11.85%** | 1.02 | 98.41 | 0.95 | 10.62 | 0.46 | 103.15/100.56 |
| FIAM Blend Target Date 2050 Q | 12.04% | 1.03 | 99.07 | 0.97 | 10.66 | 0.77 | 104.35/101.25 |
| FIAM Blend Index Target Date 2050 S | 12.21% | 1.03 | 99.10 | 0.98 | 10.65 | 0.84 | 104.50/100.92 |
| Fidelity Freedom Index 2050 Investor Class | 12.13% | 1.01 | 99.60 | 1.00 | 10.41 | 1.38 | 103.15/97.83 |
| Fidelity Freedom Index 2050 Inst. Premium Class | 12.18% | 1.00 | 99.58 | 1.01 | 10.39 | 1.43 | 103.13/97.29 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2050 TR USD | 11.22% | | | 0.92 | 10.34 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom K 2055 Fund | **11.88%** | 1.02 | 98.43 | 0.96 | 10.64 | 0.40 | 102.62/100.31 |
| FIAM Blend Target Date 2055 Q | 12.03% | 1.02 | 99.11 | 0.97 | 10.65 | 0.67 | 103.44/100.62 |
| FIAM Blend Index Target Date 2055 S | 12.20% | 1.02 | 99.11 | 0.98 | 10.64 | 0.76 | 103.67/100.27 |
| Fidelity Freedom Index 2055 Investor Class | 12.13% | 1.00 | 99.56 | 1.00 | 10.38 | 1.14 | 102.17/96.99 |
| Fidelity Freedom Index 2055 Inst. Premium Class | 12.18% | 1.00 | 99.58 | 1.01 | 10.37 | 1.26 | 102.31/96.77 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2055 TR USD | 11.34% | | | 0.93 | 10.40 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom K 2060 Fund | **11.81%** | 1.00 | 98.42 | 0.95 | 10.60 | 0.23 | 100.92/99.06 |

| Fund in Plan with Alternates Below | Returns | Beta | R2 | S/R | S/D | I/R | Up/Down Cap |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2060 Q | 12.00% | 1.01 | 99.13 | 0.97 | 10.65 | 0.50 | 102.08/99.65 |
| FIAM Blend Index Target Date 2060 S | 12.24% | 1.01 | 99.14 | 0.98 | 10.65 | 0.60 | 102.45/99.47 |
| Fidelity Freedom Index 2060 Investor Class | 12.16% | 0.99 | 99.58 | 1.00 | 10.41 | 0.96 | 101.11/96.13 |
| Fidelity Freedom Index 2060 Inst. Premium Class | 12.22% | 0.99 | 99.55 | 1.01 | 10.40 | 1.01 | 101.04/95.42 |
| **Benchmark Below** | | | | | | | |
| S&P Target Date 2060+ TR USD | 11.50% | | | 0.93 | 10.50 | | |
| | | | | | | | |
| **Fund in Plan with Alternates Below** | **Returns** | **Beta** | **R2** | **S/R** | **S/D** | **I/R** | **Up/Down Cap** |
| Fidelity Freedom Income K Fund | 5.57% | 0.67 | 86.02 | 1.38 | 2.79 | -0.39 | 78.46/54.17 |
| FIAM Blend Target Date Income Q | 5.55% | 0.64 | 85.90 | 1.42 | 2.69 | -0.48 | 77.49/52.04 |
| FIAM Blend Target Date Income S | 5.51% | 0.64 | 85.90 | 1.44 | 2.70 | -0.36 | 78.11/51.96 |
| Fidelity Freedom Index Income Investor Class | 5.39% | 0.63 | 86.44 | 1.39 | 2.65 | 0.45 | 75.67/51.69 |
| Fidelity Freedom Index Fund Inst. Premium Class | 5.43% | 0.62 | 87.13 | 1.42 | 2.61 | -0.46 | 75.65/50.28 |
| **Benchmark Below** | | | | | | | |
| S&P Target Retirement Income TR USD | 6.23% | | | 0.82 | 3.99 | | |

106.    Taking the Fidelity Freedom K Fund 2035 as an example, we learn the following from the above criteria. First, the returns for this fund is clearly the lowest among the funds.  After all, it had a higher expense ratio that than the other funds.

107.    Next, Sharpe Ratio, which factors in Standard Deviation but adds excess return to determine the amount of reward the fund is getting per unit of risk shows the fund has the lowest number by far.  This is undesirable.

108.   Lastly, the higher the IR, the more consistent the manager.  Here, with the Plan's funds consistently had lower IRs relative to the other funds.

109.   To sum up, Defendants did not choose investments based on:

- investment returns, investment returns relative to peers, and investment returns relative to benchmarks;

- their sensitivity to market movements (Beta);

- how widely their returns varied over a certain period of time. In other words, they did not choose investments based on its implied volatility (Standard Deviation);

- their correlation of returns to its benchmark's returns (R squared);

- their excess return to determine reward per unit of risk (Sharpe Ratio);

- whether a given investment has outperformed--gained more or lost less than--a broad market benchmark during periods of market strength and weakness (Upside/Downside Capture); and

-  the portfolio manager's ability to generate excess returns relative to a benchmark or the consistency of the portfolio manager (Information Ratio).

110.    Further, the Fidelity Index Fund Institutional Premium Class, using MPT theory, is the fund that would be considered best in its class and should have been chosen by the Plan's fiduciaries. This fund consistently outperformed other available options on all MPT metrics. However, even if the Fidelity Index Fund Institutional Premium Class were not selected, there were several acceptable funds the Plan's fiduciaries could have chosen using MPT theory as illustrated in the chart above. The results are the same when analyzing these funds using a 5-year performance history. An MPT analysis using 5-year performance metrics is attached hereto at Exhibit "C."

111.    Accordingly, the Committee should have realized, had it been employing an acceptable prudent process, that the funds in the Plan should have been replaced with one of the less expensive better performing alternatives identified in the chart above.

**(5)    The Committee Violated the Plan's Investment Policy Statement**

112.    Another indication of Defendants failure to follow a prudent process in selecting and monitoring Plan funds was their failure to follow the terms of the Plan's Investment Policy Statement ("IPS). As described in the IPS, the Committee has the responsibility to "[e]stablish, and modify, as appropriate, the investment policies for the Plan and the investment objectives and performance goals for the management of Plan investment options, and monitor the performance of investment options against performance criteria …" IPS at 3.

113.    Yet, the Committee allowed funds to remain in the Plan that had been outperformed as long as ten years. The Committee also selected actively managed funds over passively managed funds which was inconsistent with their obligations under the aforementioned provision. Again, the Committee selected Fidelity Freedom K target date funds that failed to beat the S&P Target Date benchmark and/or perform as well as other Fidelity funds compared to the S&P benchmark. Because the funds selected by the Committee failed analysis under the MPT the Committee violated its own IPS.

114.    For at least the foregoing reasons, the Committee violated the terms of the IPS.

**(6)    The Plan Consistently Favored Actively Managed Funds when Passive Funds Outperformed them by a Significant Margin**

115.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.[13]

---

[13] *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/getthere/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual

116.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis.[14]

117.    The majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019.

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark 5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

---

funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

[14] Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio")

118.    Digging deeper, other statistics bear out the vast underperformance of actively managed funds over passively managed funds over different stretches of 5 to 10 year periods beginning in 2008.

119.    77.97% of large-cap mutual fund managers and 73.21% of institutional accounts underperformed the S&P 500® on a gross-of-fees basis over the 10 year horizon between 2008 and 2018.[15]

120.    The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2018.[16]

| Category | Benchmark | Mutual Funds (%) Net/ Gross of Fees |
|---|---|---|
| All Domestic | S&P Comp 1500 | 84.49/75.58 |
| All L/C | S&P 500 | 85.14/ 77.97 |
| All M/C | S&P M/C 400 | 88.03/ 76.25 |
| All S/C | S&P S/C 600 | 85.67/ 76.01 |
| All Multi/C | S&P Comp 1500 | 86.36/ 77.90 |

121.    It is the same story looking at different five-year intervals over the last decade.  In 2015, over 76.23% of mutual fund managers and 85.81% of institutional accounts in the large-cap equity space underperformed the S&P 500®. In the mid-cap space, 65.81% of mutual funds and 64.71% of institutional accounts underperformed the S&P MidCap 400®.  In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®.  The findings in

[15]  *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019 p. 1.

[16]  Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019, Exhibit 2, p.6

the small-cap space dispel the myth that small-cap equity is an inefficient asset class that is best accessed via active management.

122.   The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2015.[17]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 88.43 | 79.85 | 85.00 |
| All L/C | S&P 500 | 84.13 | 76.23 | 85.51 |
| All M/C | S&P M/C 400 | 76.69 | 65.81 | 64.71 |
| All S/C | S&P S/C 600 | 90.13 | 81.11 | 81.82 |
| All Multi/C | S&P Comp 1500 | 88.56 | 79.67 | 83.20 |

123.   In 2016, in the large-cap equity space, 84.60% of mutual fund managers and 79.58% of institutional accounts underperformed the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 68.16% of large-cap mutual funds and 69.20% of institutional accounts underperformed.

124.   Similarly, in the mid-cap space, 96.03% (86.24%) of mutual funds and 92.02% (82.51%) of institutional accounts underperformed the S&P MidCap 400® on a net (gross) basis. In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®, regardless of fees.

125.   The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2016.[18]

---

[17] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, July 31st, 2016, Exhibit 2, p.5.
[18] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, August 8th, 2017, Exhibit 2, p.5

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 82.87 | 67.11 | 76.31/65.52 |
| All L/C | S&P 500 | 84.60 | 68.16 | 79.58/69.20 |
| All M/C | S&P M/C 400 | 96.03 | 86.24 | 92.02/82.51 |
| All S/C | S&P S/C 600 | 95.64 | 81.40 | 90.61/78.91 |
| All Multi/C | S&P Comp 1500 | 89.31 | 77.67 | 81.31/70.33 |

126.     In 2017, the majority of equity managers in 15 out of 17 categories underperformed their respective benchmarks over the 10-year horizon, gross-of-fees.[19]  In the preceding ten years in the large-cap equity space, 89.51% of mutual fund managers and 73.61% of institutional accounts lagged the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 71.97% of large-cap mutual funds and 62.88% of institutional accounts underperformed.  Over 80% of mutual funds underperformed the S&P SmallCap 600® (net- and gross-of-fees) over the last decade, while 86.80% (72.92%) of institutional accounts underperformed on a net (gross) basis.

127.     The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2017.[20]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 86.65 | 71.20 | 71.11/ 59.88 |
| All L/C | S&P 500 | 89.51 | 71.97 | 73.61/ 62.88 |
| All /C | S&P M/C 400 | 96.48 | 85.37 | 85.16/ 77.01 |

[19] See SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, p. 1.

[20] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, Exhibit 2, p.5.

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All S/C | S&P S/C 600 | 95.71 | 82.00 | 86.80/ 72.92 |
| All Multi/C | S&P Comp 1500 | 90.70 | 78.77 | 79.00/ 68.59 |

128.    Undeniably, fees play a major role in the active versus passive debate. After subtracting fees, returns from active management tend to be less than those from passive management, as the latter costs less.[21]

129.    "Vanguard's Principles for Investing Success," discussed *supra*, advises all investors that indexed investments can be a useful tool for cost control.  *Id.* at 17.

130.    The Plan fiduciaries' clear bias in favor of selecting actively managed funds instead of constructing a balanced Plan investment menu – or even one weighted in favor of passively managed funds - reveals the fiduciary's belief that they could outperform what most active managers cannot and what passively managed funds do on a consistent basis.  From 2014 through February 29, 2020, at least 81.48% of the "designated investment alternatives" of the Plan were actively managed.

131.    The Defendants' actions in overwhelmingly favoring actively managed funds, plausibly show that they failed to consider the pros and cons of offering actively managed investments vs. passively managed investments.

132.    Here, the Committee consistently chose actively managed funds over passively managed funds. The chart below demonstrates that, throughout the Class Period, at least 80% of

[21] Sharpe, William F., "The Arithmetic of Active Management" Financial Analysts Journal, January/February 1991, Volume 47 Issue 1. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

the funds in the Plan were actively managed funds showing that the Committee's process in selecting funds must have been deficient.

| Year | Active | Passive | % Split |
|------|--------|---------|---------|
| 2019 | 22 | 5 | 81.48%/18.52% |
| 2018 | 22 | 5 | 81.48%/18.52% |
| 2017 | 22 | 5 | 81.48%/18.52% |
| 2016 | 22 | 5 | 81.48%/18.52% |
| 2015 | 22 | 5 | 81.48%/18.52% |

133.    The Plan's fiduciaries' over reliance on actively managed funds demonstrates a lack of adherence to a prudent monitoring process that considers lower-cost passively managed alternatives that seek to achieve the same goal as actively managed funds.

134.    Defendants' failure to investigate lower cost passive alternative investments during the Class Period cost the Plan and its participants millions of dollars.

**(7)    THE PLAN LACKED DIVERSIFICATION AND CREATED ADDITIONAL CONCENTRATION RISK, HIGH CORRELATION, HIGHER VOLATILITY AND HAD POOR SECURITY SELECTION**

135.    A Plan Sponsor and Investment Committee demonstrates prudence by applying viable methodologies to choose and review investments. Insofar as doing so, the investments that they choose and review, should offer retirement plan participants a reasonable opportunity to understand the dynamics of these investments including the ability to diversify to reduce over-concentration/investment overlap, volatility, and correlation.

136.    For example, the Plan offered 5 options purporting to be in the large/mega cap space. Large cap investments are generally available in three types: (1) large cap value, (2) large cap blend and (3) large cap growth. Morningstar, a well-respected industry resource, defines the different types of large cap funds as follows. First, large cap mutual funds are defined as having

"Stocks of large-cap companies that are less expensive or growing more slowly than other large-cap stocks. Stocks in the top 70% of the capitalization of the U.S. equity market are defined as large cap." Available at https://www.morningstar.com/large-cap-value-stocks (last accessed on November 4, 2021).

137.    Secondly, large cap blend funds are defined as being "fairly representative of the overall U.S. stock market in size, growth rates, and price. … The blend style is assigned to portfolios where neither growth nor value characteristics predominate." Available at https://www.morningstar.com/large-blend-funds (last accessed on November 4, 2021). Finally, large cap growth mutual funds are defined as having "[s]tocks of large-cap companies that are projected to grow faster than other large-cap stocks." Available at https://www.morningstar.com/large-cap-growth-stocks (last accessed on November 4, 2021).

138.    Aside from target date investment solutions, L3/L3 Harris's methodology for choosing investments produced 5 mutual funds where mega/large caps were the dominant equity positions. These 5 funds are the Dodge and Cox Stock Fund, American Funds Growth Fund of America R6, Fidelity Balanced K, Fidelity Magellan K and the Fidelity 500 Index Adv IS/IPR. A substantial portion of participants savings were invested in these funds. In 2015, these 5 funds contained more than $1.2 billion dollars or more than 26% of the total plan assets, in 2016 the amount was more than $1.27 billion dollars or more than 25% of plan assets, in 2017, the amount was $1.5 billion dollars and more than 25% of the Plan's assets. In 2018 and 2019 the amount invested in these 5 funds was more than $1.3 billion dollars and $1.6 billion dollars in assets, respectively.

139.    Looking at these five funds with the "eye" and commitment of a fiduciary, the following is discovered about the characteristics of these 5 investment options:

      A.    The 5 funds had only 25 top 10 holdings combined (maximum 50);

B.   Alphabet C and Microsoft were top 10 positions in all 5 mutual funds;

C.   Facebook A and Amazon were top 10 positions in 4 out of 5 mutual funds (not Dodge & Cox Stock;

D.   United Health, Alphabet A, & Apple were top 10 positions in 3 out of 5 mutual funds (not Dodge & Cox Stock or Fidelity 500 Index Adv IS/IPR);

E.   Capital One, BofA, Charter Communications A, Mastercard A, Visa A were positions found in 2 of any of the 5 mutual funds five times as a top 10 holding;

F.   American Growth Fund of America R6, Fidelity Magellan K, and Fidelity 500 Index had Alphabet C, Microsoft, Facebook A, & Amazon, as a top 10 holding;

G.   American Growth Fund of America R6, Fidelity Magellan K had Alphabet C, Microsoft, Facebook A, Amazon, and United Health as a top 10 holding.

140.   These 5 non-target date large cap equity investments, which had more than $1.2 billion AUM from 2015-2019 that represented more than 25% of all of the assets in the plan from 2015-2018, offered little differentiation and collectively offered little diversification, more concentration risk, the likelihood of higher volatility, and additional correlation between the investments because the top 10 positions were so similar.

141.   Further, these 5 purported large-cap investments also drifted in style and capitalization. Even though the investments claimed to be focused on a specific style (Growth, Blend, Value) they drifted into one another and also had the tendency to drift down to the same styles in mid cap investments. As a result the investments were highly misleading to any participant trying to diversify their assets.

142.   For example, using the most recently available data, the Dodge and Cox Stock Fund, consists of 40% Large Cap Value, 28% Large Cap Blend, 11% Large Cap Growth, 13% Mid Cap Value, 3% Mid Cap Blend, 5% Mid Cap Growth, 1% Small Cap Value. Based on this breakout, Morningstar, a well-respected industry resource, cannot not track this fund as a true large-cap fund and instead must use an alternate index to track the fund, namely, US Large Mid Brd Val TR USD. Similarly, The American Funds Growth Fund of America R6 consists of 52%

42

Large Cap Growth, 21% Large Cap Blend, 7% Large Cap Value, 9% Mid Cap Growth, 6% Mid Cap Blend, 3% Mid Cap Value, 1% Small Cap Growth, 1% Small Cap Blend. Again, Morningstar is unable to track this fund as a true large cap fund an instead must use an alternate index to track it, namely, US Large Mid Brd Grt Tr USD. Similar results are seen for the Fidelity Magellan K and the Fidelity Balanced K funds. These drifts in style deprived participants of any meaningful ability to diversify their investments.

143.     Had the Committee engaged in an appropriate process for selecting funds for the Plan, it would not have chosen funds that deprived plan participants of any meaningful large cap investment to diversify their portfolio. Instead of providing proper diversification, the five funds produced concentrated risk, added high correlation, higher volatility and poor security.

**(8)     The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period**

144.     Another indication of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

145.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

146.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

a.   Recordkeeping;

b.  Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

c.  Administrative services related to converting a plan from one recordkeeper to another;

d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

e.  Maintenance of an employer stock fund (if needed);

f.  Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.  Plan consulting services, including assistance in selecting the investment lineup offered to participants;

h.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[22] (excluding the separate fee charged by an independent third-party auditor);

i.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

147.   This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita

---

[22]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

148.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

        A.  Loan processing;

        B.  Brokerage services/account maintenance (if offered by the plan);

        C.  Distribution services; and

        D.  Processing of qualified domestic relations orders.

149.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

150.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

151.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by

a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

152.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*). "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

153.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

154.    In this matter, using revenue sharing or a combination of revenue sharing and a flat fee to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. In fact, as alleged in Section A(2) above, the Defendants may have imprudently selected the K class shares of the target date funds in the Plan specifically because they could offset their excessive administrative and record

46

keeping costs with revenue sharing in a way that would be the least obvious to participants. In fact, as referenced in Section A(2) above, the K class of the Fidelity Freedom target date funds pay 20 basis points in revenue sharing above the K6 class of the Fidelity Freedom target date funds which amounted to a staggering $2.5 million dollars in revenue sharing in 2019 alone.

155.   Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

156.   The fact that the Plan has stayed with the same recordkeeper, namely Fidelity, over the course of the Class Period, and paid the same relative amount in recordkeeping and administration fees, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

157.   As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans:

| Year | Participants | Direct Cost | Indirect Cost[23] | Total Cost | $PP |
|------|--------------|-------------|-------------------|------------|-----|
| **2015** | 50,000[24] | None Reported | $3,415,979 | $3,415,979 | $68.32 |
| **2016** | 50,997 | None Reported | $3,541,926 | $3,541,926 | $69.45 |
| **2017** | 50,327 | None Reported | $4,148,222 | $4,148,222 | $82.43 |
| **2018** | 47,853 | None Reported | $3,457,338 | $3,457,338 | $72.25 |
| **2019** | 76,240 | $1,329,911 | $4,083,413 | $5,413,324 | $71.00 |

158.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

159.    At all times during the Class Period, the Plan had over 35,000 participants making it eligible for some of the lowest fees on the market.

160.    Looking at recordkeeping costs for plans of a similar size in 2019 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having more than 30,000 participants and approximately $3 billion dollars in assets under management:

| Comparable Plans' R&A Fees Paid in 2019[25] | | | | | |
|---------------------------------------------|--|--|--|--|--|
| **Plan Name** | **Number of Participants** | **Assets Under Management** | **Total R&A Costs[26]** | **R&A Costs on Per-Participant Basis** | **Record-keeper** |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |

---

[25] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[26] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

| Comparable Plans' R&A Fees Paid in 2019[25] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs[26] | R&A Costs on Per-Participant Basis | Record-keeper |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $1,124,994 | **$34** | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | **$30** | Alight Financial |

161.    Thus, the Plan, with over 50,000 participants and over $13 billion dollars in assets in 2019, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present. Although there's some indication that the Plan negotiated a lower recordkeeping cost beginning in 2020, it's expected that the total amount of recordkeeping and administrative costs will be similar in 2020 and 2021 as they were in 2015 through 2019 when all revenue sharing is taken into account.

---

[25] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[26] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

162.    The Plan's total recordkeeping and administrative costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day[27].

163.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Prudence
### (Asserted against the Committee)

164.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

165.    At all relevant times, the Committee and its members ("Prudence Defendant") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

166.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the

---

[27] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

167.   The Prudence Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendant also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

168.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

169.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendant is liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

170.   The Prudence Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches

of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against L3Harris and the Board)**

171.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this

Complaint as if fully set forth herein.

172.    L3Harris and the Board (the "Monitoring Defendants") had the authority to appoint

and remove members of the Committee, and the duty to monitor the Committee and was aware

that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

173.    In light of this authority, the Monitoring Defendants had a duty to monitor the

Committee Defendants to ensure that the Committee Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that

the Committee Defendants were not fulfilling those duties.

174.    The Monitoring Defendants also had a duty to ensure that the Committee

Defendants possessed the needed qualifications and experience to carry out their duties; had

adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plan's investments; and reported

regularly to the Monitoring Defendants.

175.    The Monitoring Defendants breached their fiduciary monitoring duties by, among

other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants

    or have a system in place for doing so, standing idly by as the Plan suffered significant

    losses as a result of the Committee Defendants' imprudent actions and omissions;

52

(b)      failing to monitor the processes by which Plan investments were evaluated and their failure to investigate the availability of lower-cost share classes; and

(c)      failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

176.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

177.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: March 18, 2022

**MATTHEW FORNARO, P.A.**

*/s/ Mathew Fornaro*
Matthew Fornaro, Esq.
FL ID #650641
Matthew Fornaro P.A.
11555 Heron Bay Boulevard
Suite 200
Coral Springs, FL  33076
Telephone:  (954) 324-3651
Fax:  (954) 248-2099
mfornaro@fornarolegal.com

*/s/ Donald R. Reavey, Esq.*
Donald R. Reavey, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
Telephone:  (717) 233-4101
Fax:  (717) 233-4103

*/s/ Mark K. Gyandoh, Esq.*
Mark K. Gyandoh, Esquire
Gabrielle Kelerchian, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
PA Attorney ID # 324248
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
Telephone:  (610) 890-0200
Fax:  (717) 233-4103

Counsel for Plaintiffs and the Putative Class