UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| ROBERT STENGL, DANIEL WILL, RONALD F. KOSEWICZ, GARY K. COLLEY, LESLIE D. DIAZ, AMAYA JOHNSON, WILLIAM A. MCKINLEY, AND JOHN KARIPAS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>      Plaintiffs,<br><br>v.<br><br>L3HARRIS TECHNOLOGIES, INC., THE BOARD OF DIRECTORS OF L3HARRIS TECHNOLOGIES, INC., THE INVESTMENT COMMITTEE OF L3HARRIS TECHNOLOGIES, INC. AND JOHN DOES 1-30,<br><br>      Defendants. | Case No.:  6:22-cv-00572-PGB-LHP |

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendants L3Harris Technologies, Inc., the Board of Directors of L3Harris Technologies, Inc., the Investment Committee of L3Harris Technologies, Inc. (collectively "Defendants") move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). In support of this motion, Defendants state:

## INTRODUCTION

This action arises out of a 401(k) plan sponsored by L3Harris Technologies, Inc. The gist of the Amended Complaint ("Complaint")—which is identical in all material respects to the original complaint—is that the Plan's fiduciaries violated ERISA by choosing investment options that were allegedly too expensive and paying too much in recordkeeping fees. While there are many lawsuits pending nationwide making similar allegations against other 401(k) plans, the allegations here are very similar to those Plaintiffs' counsel made in *Matney v. Barrick Gold of N. Am., Inc.*, No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022), *appeal filed*, No. 22-4045 (10th Cir. May 20, 2022). The court dismissed the claims in that case, and the claims here should be dismissed for the same reasons.

As to the investment claims, Plaintiffs mainly contend that some of the Plan investment options were imprudent because their fees were too high. But the Complaint's own allegations show that claim is implausible. The Complaint concedes that a portion of those fees was rebated to Plan participants, Doc. 40 ¶ 155, but when the Complaint compares the Plan fees to those of other options, it does not account for the rebate. Once the rebate is considered, the Plan fees are lower than Plaintiffs' chosen alternatives. Plaintiffs also compare the fees to the median and average fees

from a 2018 study, but that study acknowledges that the figures cannot be used to benchmark fees for a specific plan. The rest of Plaintiffs' investment claims reduce to a demand that the fiduciaries should have adopted Plaintiffs' preferred investment techniques, but without any claim that the fiduciaries' practices were outside the reasonable range of those of other fiduciaries. Courts, including in *Barrick Gold*, have rejected many of these theories, and they should be rejected here too.

As to the recordkeeping claim, the judicially noticeable facts show that Defendants obtained annual decreases in recordkeeping fees—making the facts here virtually identical to those found insufficient in *Barrick Gold*. Defendants obtained reductions in 2015, 2016, and 2018 and obtained a new fee of ███████████ in mid-2018 and ██████████████ in 2020. The Complaint alleges that as of 2019 reasonable recordkeeping fees were between $21 and $34 per participant. The Plan's fees ████████████, which confirms that Plaintiffs' claims are implausible.

In addition, Plaintiffs bring a failure-to-monitor claim in Count II. This claim is derivative of their fiduciary breach claims, so it fails for the above reasons.

All of these issues were present in the original complaint, and Plaintiffs have not addressed them, which shows that Plaintiffs have nothing else they can allege. Thus, the Court should grant this motion and dismiss this case with prejudice.

## BACKGROUND

### A.    The Parties.

Defendant L3Harris Technologies, Inc. ("L3Harris") is an aerospace and defense technology company. Doc. 40 at ¶ 36. L3Harris was created in June 2019

through a merger between L3 Technologies, Inc. ("L3") and Harris Corporation ("Harris"). Ex. 1, 2019 L3 Technologies Master Savings Plan Form 5500 at 27;[1] *see also* Doc. 40 ¶ 1 n.3. The other defendants are alleged to be fiduciaries of the L3Harris Retirement Savings Plan (the "L3Harris Plan"). Doc. 40 p. 1 n.2 & ¶¶ 41, 45. Plaintiffs are former employees who allegedly participated in the Plan. *Id.* ¶¶ 26–33.

**B.   The Plan.**

Before the 2019 merger, L3 and Harris each had their own 401(k) plans to help employees save for retirement. *See* Ex. 1, 2019 L3 Technologies Master Savings Plan Form 5500 at 27. The legacy L3 plan was known as the L3 Technologies Master Savings Plan ("Legacy L3 Plan"). *Id.* The legacy Harris plan was known as the Harris Corporation Retirement Savings Plan. *See* Ex. 2, 2018 Harris Fee Disclosure. Each plan had a different menu of investment options. *Compare* Ex. 3, 2018 L3 Fee Disclosure at 6–15, *with* Ex. 2, 2018 Harris Fee Disclosure at 8–15. Effective December 31, 2019, the two plans were merged, and became the L3Harris Plan. *See* Ex. 1, 2019

---

[1] On a motion to dismiss, the Court may take judicial notice of public records, including Form 5500s. *See, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (public records); *Barrick Gold*, 2022 WL 1186532, at *3 (Form 5500s); *White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137, at *5 (N.D. Cal. May 31, 2017) ("*White II*") (same), *aff'd*, 752 F. App'x 453 (9th Cir. 2018). The Court may also consider documents attached to a defendant's motion to dismiss that are cited in a complaint, central to the claims at issue, and whose contents are not disputed, including recordkeeping agreements, participant fee disclosures, and the Brightscope/ICI study discussed in the Complaint. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007); *Barrick Gold*, 2022 WL 1186532, at *3 (taking judicial notice of a recordkeeping agreement and Brightscope/ICI Study); *Tobias v. NVIDIA Corp.*, No. 20-CV-06081, 2021 WL 4148706, at *4 (N.D. Cal. Sept. 13, 2021) (same); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685, 2019 WL 4466714, at *1 n.1 (S.D.N.Y. Sept. 18, 2019) (taking judicial notice of participant fee disclosures).

L3 Technologies Master Savings Plan Form 5500 at 27. When the plans were merged, all of the Legacy L3 Plan investment options were eliminated (including the ones attacked in the Complaint), and the L3Harris Plan offered the investment options from the Legacy Harris Plan. *See* Ex. 4, MSP to RSP Investment Options Guide. These facts are important because, while the Complaint does not distinguish between the two legacy plans, the allegations focus on the period from 2015 to 2019 (prior to the merger of the two plans) and attack the investment options and recordkeeping fees only of the Legacy L3 Plan. *See* Doc. 40, p. 1 n.2 & ¶¶ 75–168. In this brief, therefore, "the Plan" will mean the Legacy L3 Plan for the period from 2015 to 2019, and the L3Harris Plan for the period from 2020 to the present.

Employees that chose to participate in the Plan had the ability to contribute some of their earnings to an individual account. *See* Doc. 40 ¶ 49. Each participant controlled how this money was invested, *see id.* ¶ 58, and was offered a diverse menu of investment options , *see, e.g.,* Ex. 2, 2018 Harris Fee Disclosure at 9–15; Ex. 3, 2018 L3 Fee Disclosure at 6–15; Ex. 5, 2019 L3Harris Fee Disclosure at 8–15.

### C.   The Plan Investment Options.

Between 2015 and 2019, the Plan generally offered 29 investment options. *See* Ex. 2, 2018 Harris Fee Disclosure at 9–15; Ex. 3, 2018 L3 Fee Disclosure at 6–15. In 2019, the Plan offered 5 passively managed options and 22 actively managed options, Doc. 40 ¶ 133, across a number of investment styles, including large cap, mid-cap, and small-cap, *see id.* ¶¶ 136–42; Ex. 3, 2018 L3 Fee Disclosure at 6–15. Of the total number

of investment options, 13 were a suite of target date mutual funds known as the Fidelity Freedom funds. Ex. 3, 2018 L3 Fee Disclosure at 8–13. A target date fund is a mutual fund whose investment mix is geared to a specific retirement date (e.g., the Fidelity Freedom 2055 fund has an asset mix appropriate for employees who plan to retire in 2055). *See id.*; Doc. 40 ¶ 106. Initially the investments are heavily weighted toward equities and less toward bonds, but as the target date gets closer, the investment mix becomes more heavily weighted in bonds and thus more conservative. *See* Ex. 6, Fidelity Freedom Fund Prospectus at 7–8.

### D.   The Plan's Recordkeeping Arrangement.

Employers generally hire a third-party to handle all of the back office tasks needed to run a 401(k) plan. *See* Doc. 40 ¶ 146. Such tasks include tracking participant account balances, handling communications with participants, and helping to ensure regulatory compliance. *See id.* ¶ 147. Although they do more than keep records, such entities are usually referred to as recordkeepers. *See id.* ¶¶ 146–49. The cost of their services can be paid in one of two ways. *See id.* ¶ 152. One way is to have the participants pay fees directly by deducting them from participants' accounts. *See id*. Another way is through a practice known as revenue sharing. *Id.* When a plan uses revenue sharing, a portion of an investment option's expense ratio is paid to the recordkeeper to cover the plan's recordkeeping fees. *See id.* There is no "right" way to pay recordkeepers, *see id.* ¶ 153 ("[A] revenue sharing approach is not *per se* imprudent . . . ."), but the only way to do it through revenue sharing is to offer share classes of

mutual funds that pay revenue sharing, *see id.* ¶ 152. Most of the funds identified in the Complaint, especially the Fidelity Freedom funds, offered several share classes that paid revenue sharing and one share class that did not. *See id.* ¶ 155.

Fidelity was the Plan's recordkeeper, and its fees were set forth in a contract known as the Master Trust Agreement. *See* Ex. 7, 7/1/2012 Recordkeeping Agreement at 33 & Schedule B (Excerpt). Before July 1, 2018, Fidelity's recordkeeping fees were paid via revenue sharing. *See* Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement (Excerpt) at 1, 3. However, the contract was amended several times to reduce the amount of revenue sharing payments Fidelity could retain (thereby lowering fees). At the start of 2015, Fidelity agreed to rebate $750,000 of the revenue sharing amounts to Plan participants. *See* Ex. 9, 1/1/2015 5th Amendment to Recordkeeping Agreement at 1. In 2016, the rebate was increased to $1.5 million. *See* Ex. 10, 1/1/2016 6th Amendment to Recordkeeping Agreement at 1. In mid-2018,

██████████████████████████████████████████

██████████████████████████████████████████

████████████. *See* Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement (Excerpt) at 1, 3. A table in the Complaint that shows the fees allegedly paid in 2019 by comparable plans, and the range is $21–$34 per participant. Doc. 40 ¶ 165. In other words, Plaintiffs' own allegations show that the Plan was paying reasonable recordkeeping fees of ████████████. And in 2020, once the two legacy plans were merged, the fee ████████████████. Ex. 11, 5/1/2018 L3Harris Recordkeeping Agreement (Excerpt) at 79.

E.      **The Amended Complaint.**

In March 2022, Plaintiffs filed this lawsuit. In May 2022, Defendants filed a motion to dismiss. *See* Doc. 35. Rather than responding, Plaintiffs filed the Amended Complaint, but it nearly identical to the original and does not even attempt to address the arguments Defendant made previously. *See* Ex. 14, Redline Comparison. Count I alleges that Defendants breached their fiduciary duty of prudence under ERISA, 29 U.S.C. § 1104(a). Doc. 40 ¶¶ 171–72. Count II alleges that Defendants violated ERISA by failing to monitor the Plan's fiduciaries. *Id.* ¶¶ 179–80.

## ARGUMENT

I.      **Plaintiffs Fail to State a Claim for the Breach of the Fiduciary Duty of Prudence Under ERISA.**

Count I alleges that Defendants breached their duty of prudence by (1) including investment options charging excessive management fees, (2) failing to engage in a prudent process for selecting the Plan's investment options, (3) offering five funds that had some similar underlying holdings, and (4) causing participants to pay excessive recordkeeping fees. Each of these claims should be dismissed.

A.      **Plaintiffs' Investment-Management-Fee Claim is Implausible.**

Plaintiffs allege that the Plan's investment options charged excessive investment management fees compared to available alternatives—different share classes, collective investment trusts ("CITs"), and passively managed options—and when compared to fees reported in a 2018 study. None of these allegations give rise to a plausible inference that Defendants breached their fiduciary duty of prudence.

### 1.   Share Classes.

Plaintiffs allege that the Plan menu included the K share class of the Fidelity Freedom Funds when the less expensive K6 share class was available. Doc. 40 ¶¶ 83–91. This claim should be dismissed because it is contradicted both by the Complaint and by judicially noticeable documents, which provide an "obvious, alternative explanation" for why the Plan offered the K share class instead of K6: the K share class provided a 20-basis-point-revenue credit ("bps credit") that made it less expensive for participants on a net basis than the K6 share class. *Id.* ¶ 155.

Paragraph 86 of the Complaint contains a table that compares the 2019 expense ratios of the K and K6 share classes of the Fidelity Freedom funds. *Id.* But this table omits a key piece of information: as the Complaint concedes, *see id.* ¶ 155, the Plan received a 20 bps credit for the K share class of the Fidelity Freedom Fund suite. *See* Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement (Excerpt) at 13. Once the table in Paragraph 86 of the Complaint is corrected to account for the revenue credit, it shows that the K share class was less expensive than the K6 share class (comparing the third and fifth columns from the left, marked A and B):

| L3 Plan Fund | Nominal Exp Ratio for K Share Class | Exp Ratio for K Share Class Accounting for 20 bps Revenue Credit (A) | Pls.' Alternative Share Class | Exp Ratio for K6 Share Class (B) |
|---|---|---|---|---|
| Fid Fr Inc K | 0.42% | 0.22% | Fid Fr Inc K6 | 0.37% |
| Fid Fr 2005 K | 0.42% | 0.22% | Fid Fr 2005 K6 | 0.37% |
| Fid Fr 2010 K | 0.46% | 0.26% | Fid Fr 2010 K6 | 0.39% |

| Fid Fr 2015 K | 0.49% | 0.29% | Fid Fr 2015 K6 | 0.41% |
|---|---|---|---|---|
| Fid Fr 2020 K | 0.53% | 0.33% | Fid Fr 2020 K6 | 0.43% |
| Fid Fr 2025 K | 0.56% | 0.36% | Fid Fr 2025 K6 | 0.45% |
| Fid Fr 2030 K | 0.60% | 0.40% | Fid Fr 2030 K6 | 0.47% |
| Fid Fr 2035 K | 0.63% | 0.43% | Fid Fr 2035 K6 | 0.49% |
| Fid Fr 2040 K | 0.65% | 0.45% | Fid Fr 2040 K6 | 0.50% |
| Fid Fr 2045 K | 0.65% | 0.45% | Fid Fr 2045 K6 | 0.50% |
| Fid Fr 2050 K | 0.65% | 0.45% | Fid Fr 2050 K6 | 0.50% |
| Fid Fr 2055 K | 0.65% | 0.45% | Fid Fr 2055 K6 | 0.50% |
| Fid Fr 2060 K | 0.65% | 0.45% | Fid Fr 2060 K6 | 0.50% |

Courts presented with this exact situation—where plaintiffs compare two share classes but without accounting for a revenue credit that makes the net fee lower—have dismissed prudence claims premised on the failure to select the non-revenue-credit share class. *See Barrick Gold*, 2022 WL 1186532, at *7; *White II*, 2017 WL 2352137, at *14. *Barrick Gold* is right on point. In that case, the plan's target date funds paid a 15 bps credit to the Plan, so the court compared the adjusted expense ratio net of the 15 bps credit to a proposed alternative share class, and dismissed the claim because the share class used by the plan was actually less expensive. 2022 WL 1186532, at *7. Similarly, in *White II*, the court recognized that a 10 bps credit "provides an 'obvious, alternative explanation' for why the . . . Plan included retail share classes of certain funds—those share classes paid the Plan's recordkeeping expenses . . . ." 2017 WL 2352137, at *14.

As in *Barrick Gold* and *White II*, and as shown above, Plaintiffs' allegations fail to give rise to a plausible inference that Defendants breached their duty of prudence by retaining the K share class.

### 2.   CITs.

Plaintiffs also allege that the Plan's fiduciaries failed to investigate CITs as less costly alternatives to two of the Plan's mutual funds: the Fidelity Diversified International Fund K and the Fidelity Magellan Fund K. Doc. 40 ¶ 97. But this claim fails for multiple reasons.

First, ERISA does not "require[] plan fiduciaries to include any particular mix of investment vehicles in their plan." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). Thus, courts have held that fiduciaries have no duty to investigate CITs as alternatives to mutual funds. *See, e.g.*, *Barrick Gold*, 2022 WL 1186532, at *8 (dismissing claim based on failure to investigate CITs); *NVIDIA,* 2021 WL 4148706, at *4 (same); *see also Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 212–13 (D. Mass. 2020).

The reason that fiduciaries have no such duty is in part because the structural and regulatory differences between CITs and mutual funds mean they cannot be meaningfully compared. Not only are "the regulatory agencies overseeing each investment type different," but "CITs are not required to file prospectuses or comply with reporting requirements, and CITs cannot be rolled over if the employee changes employment." *Barrick Gold*, 2022 WL 1186532, at *8; *Riley v. Olin Corp.*, No. 21-cv-01328, slip op. at 12 (E.D. Mo. June 21, 2022); *NVIDIA,* 2021 WL 4148706, at *4;

*Moitoso*, 451 F. Supp. 3d at 212–13. Plaintiffs' allegations about CIT alternatives to the Plan's mutual funds are therefore an apples-to-oranges comparison, and they should be rejected for this reason alone.

But this claim also should be dismissed because it suffers from the same problem as the share class theory: the Plan's options had expense ratios lower than or nearly identical to CITs when comparing the net cost of the Plan's investment options, after accounting for the revenue credit. Paragraph 97 of the Complaint contains a table that compares the 2021 expense ratios of the two challenged options to the CIT versions of those funds. Doc. 40 ¶ 97. While neither of these two funds was on the Plan menu in 2021,[2] they were in 2019: the Fidelity Diversified International Fund was in the K6 share class, and the Fidelity Magellan Fund was in the K share class and paid a 20 bps credit. *See* Ex. 3, 2018 L3 Fee Disclosure at 6; Doc. 40 ¶ 155. When the table in Paragraph 97 is corrected to account for the revenue credit for the Magellan Fund, it shows that the Plan's options were less expensive or nearly identical to the CITs:

| L3 Plan Fund | 2019 Exp Ratio | Expense After Accounting for Any Revenue Credit | Pls.' CIT Alternative | Pls.' Alleged Exp Ratio |
|---|---|---|---|---|
| Fid Div Int'l Fund K6 | 0.60% | 0.60% | Fid Div Int'l Fund CIT | 0.58% |
| Fid Magellan K | 0.59% | 0.39% | Fid Magellan CIT | 0.43% |

---

[2] As noted above, *supra* p. 4, when the two legacy plans merged, all of the investments from the Legacy L3 Plan were eliminated, including these two. Here, Defendants accept as true the alleged CIT expense ratios, but use the expense ratios in place in 2019, as shown in Exhibit 4.

Plaintiffs admit as much with respect to the Fidelity Diversified International Fund—noting that the proposed CIT would have been only "two basis points" (0.02%) lower in cost, *id.* ¶ 97 n.11—and courts have dismissed claims where the expense ratio differences between plan options and alternative investments are small. *See Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (affirming dismissal when the differences were "between just .06 and .11 percentage points"). And while Plaintiffs claim that "the change" to the K6 share class of the Fidelity Diversified International Fund in 2018 "was too little to[o] late," Doc. 40 ¶ 97 n.11, there are no allegations the CITs were less expensive.

### 3.   Passively Managed Funds.

Plaintiffs also contend that the fact that the Plan lineup included more actively managed funds (22) than passively managed funds (5) gives rise to an inference that Defendants' investment selection process was imprudent. *Id.* ¶¶ 133–34. But courts have held that the bare allegation that a plan included actively managed funds does not state a plausible imprudence claim. Nor can actively managed funds be meaningfully compared to passive options, and even if they could, Plaintiffs plead the same generalized allegations about the cost and performance that other courts have held are insufficient. Plaintiffs' allegations reduce to a claim that fiduciaries must select the cheapest options available, and this claim fails as a matter of law.

In *Smith v. CommonSpirit Health*, the Sixth Circuit held that plaintiffs failed to state a plausible claim by merely alleging that a plan offered actively managed funds alongside passive options. No. 21-5964, slip op. at 6–7 (6th Cir. June 22, 2022); *accord*

*Davis*, 960 F.3d at 485. As the Sixth Circuit noted, actively managed funds "represent a common fixture of retirement plans, and there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns over the course of the long lifespan of a retirement account." *Id.* at 6.

Nor can comparisons between active and passive options state a plausible imprudence claim, as each option has "different aims, different risks, and different potential rewards." *Smith v. CommonSpirit Health*, No. 21-5964, slip op. at 8 (6th Cir. June 22, 2022) (quoting *Davis*, 960 F.3d at 485); *see also Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306–07 (D. Minn. 2021); *Rosenkranz v. Altru Health System*, No. 3:20-cv-168, 2021 WL 5868960, at *10 (D.N.D. Dec. 10, 2021). "A comparison between passively managed and actively managed funds is [therefore] not meaningful . . . ." *Parmer*, 518 F. Supp. 3d at 1306 (quoting *Davis*, 960 F.3d at 485).

Even if passive options were an appropriate benchmark for the Plan's actively managed funds, Plaintiffs' allegations about performance are too generalized to state a plausible imprudence claim. In *Barrick Gold*, the court held that plaintiffs failed to state a claim for the breach of the duty of prudence where they presented "generalities, comparing fund categories (for example, large-cap, mid-cap, small-cap, domestic equity) to corresponding market indexes (for example, S&P 500, S&P MidCap 400, S&P SmallCap 600, S&P Composite 1500)[, and] . . . list[ed] 'percentage[s] of funds that underperformed their benchmark.'" 2022 WL 1186532, at *9. The Complaint makes the same sort of generalized comparisons between actively managed and passively managed funds. *See* Doc. 40 ¶¶ 118, 121, 123, 126, 128. And Plaintiffs own

allegations undermine their generalized claims about the performance of active and passive options, conceding that actively managed funds can be superior to passively managed funds over certain periods. Doc. 40 ¶ 116 ("[M]utual funds may outperform . . . a passively-managed index fund[] over the short term . . . .").[3] The Complaint thus fails to state a plausible claim simply because the Plan offered actively managed funds.

### 4.   Brightscope/ICI Study.

Plaintiffs also allege that the fees of some of the Plan investment options were excessive by comparing them to the median and average fees in a 2018 study conducted by Brightscope/ICI. Doc. 40 ¶¶ 78–80. But this claim is undermined by the very study on which Plaintiffs rely and is not cognizable in any event.

As an initial matter, there is no support for the claim that any fee in excess of an industry median or average plausibly suggests imprudence, as Plaintiffs argue. On the contrary, courts have held that Plaintiffs cannot state a prudence claim simply by pointing to industry averages, which always reflect a range of fiduciary judgments. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 52–53 (1st Cir. 2018). Courts have also noted that the "failure to select the investments with the lowest fees is not sufficient to plausibly state a claim for breach of the duty of prudence." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, No. 19-CV-04618, 2021 WL 229235, at *9 (N.D. Cal. Jan. 21, 2021);

---

[3] Plaintiffs also allege that the Committee violated the Plan's investment policy statement ("IPS") by including more actively managed funds than passively managed funds. *See id.* ¶¶ 113–14. The Complaint does not allege that the IPS says anything about active versus passive funds, so this claim is meritless. To the extent this is simply another way of saying that the Plan should have offered only passive funds, it fails for the same reasons discussed above.

*Hecker*, 556 F.3d at 586 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."). Instead, Plaintiffs can only state a claim by "provid[ing] a meaningful benchmark against which to compare the fees incurred by the" challenged funds. *Anderson*, 2021 WL 229235, at *9; *see Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822–24 (8th Cir. 2018); *Barrick Gold*, 2022 WL 1186532, at *5–6.

Here, Plaintiffs' proposed benchmark is the median and average expense ratios reported in the Brightscope/ICI Defined Contribution Plan Profile ("ICI Study"). The ICI Study reports the median and average expense ratios for various investment categories of mutual funds, including target date funds, domestic equity funds, and domestic bond funds. *See* Ex. 12, ICI Study (Excerpt) at 59, 66; *see also* Doc. 40 ¶¶ 75–82. In the Complaint, Plaintiffs match the investment style of the Plan's funds to one of the investment categories in the ICI Study and compare the expense ratios of the Plan funds with those of the ICI Study's median and average. *See* Doc. 40 ¶¶ 75–82.

The ICI Study, however, does not provide appropriate benchmarks. As the ICI Study explains, "[t]the fund investment categories used in this report are broad and encompass diverse investment styles within the investment types." Ex. 12, ICI Study (Excerpt), at 53. As a result, the ICI Study notes that, "this material is not intended for benchmarking the costs of specific plans to the broad averages presented here." *Id.* In other words, the ICI Study specifically says that one should not use the study for the precise purpose for which Plaintiffs are using it here—to benchmark the fees of

investments in specific plans. As a result, the figures in the ICI Study do not allow for meaningful evaluation of the fees of any given plan.

The ICI Study gives two examples of why the figures should not be used to compare fees that are particularly applicable here. First, in the table in Paragraph 79 of the Complaint, there are four Plan funds that are categorized as "Domestic Equity" funds with a median fee of 0.31%. Doc. 40 ¶ 79. However, the ICI Study explains that the Domestic Equity category includes many different types of funds, including "growth, sector, alternative strategies, value, and blend." Ex. 12, ICI Study (Excerpt), at 53. All of these types of domestic equity funds would have different fees, but the study aggregates them all, so comparing one type of fund to the median or average is meaningless. Second, the ICI Study points out that fees will vary from plan to plan depending on "whether administrative and recordkeeping fees are included in the expense ratios or charged outside of them." *Id.* In other words, the ICI Study makes clear that the medians and averages may include funds with fees that do not include revenue sharing, making any comparison to fees that include a revenue sharing component (like the ones here) inappropriate.

Courts have acknowledged these limitations of the ICI Study data and have dismissed excessive fee claims premised on them. *See, e.g.*, *Olin*, slip op. at 10–12; *Barrick Gold*, 2022 WL 1186532, at *5–6; *Perkins v. United Surgical Partners Int'l Inc.*, No. 3:21-CV-00973-X, 2022 WL 824839, at *6 & nn.41–42 (N.D. Tex. Mar. 18, 2022) (collecting cases); *Parmer*, 518 F. Supp. at 1303–04. Indeed, in *Barrick Gold,* the court specifically pointed to the broad categories averages as a reason to reject any reliance

on the ICI Study.

**B.    Plaintiffs Fail to Plausibly Allege that Defendants Engaged in an Imprudent Selection Process Based on Alternative Measures of Performance.**

Plaintiffs present several "metrics used to evaluate investments under the Modern Portfolio Theory" and allege that Defendants failed to consider these particular measures in evaluating the Fidelity Freedom funds. Doc. 40 ¶¶ 103, 105–06. They also allege that there were several better performing alternatives to the Fidelity Freedom funds based on these metrics. These allegations fail to state a claim for relief.

Plaintiffs allegations amount to a contention that Defendants should have employed Plaintiffs' preferred metrics to evaluate the Plan's investment options, and that no other evaluation criteria would satisfy Defendants' fiduciary obligations. But there is no basis for this claim. There is no one "correct" way to evaluate investment options. On the contrary, as the Supreme Court recently recognized, courts "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022). Plaintiffs do not allege that Defendants used metrics or conducted a review of the investments that was outside the range of reasonable fiduciary judgments; all they allege is that Defendants did not use Plaintiffs' preferred methods. Plaintiffs cannot cite any cases supporting the notion that fiduciaries must consider the particular review metrics they have identified in order to act prudently.

Plaintiffs' allegations demonstrate precisely why courts generally defer to reasonable fiduciary judgments. In Paragraph 106, Plaintiffs cite seven different

statistics for both the Plan funds and the comparator funds. The relevance of most of these statistics is not explained; sometimes the Plan funds are higher, sometimes they are lower, and sometimes they are in the middle. The Complaint does not allege how these statistics combine to show that any Plan investment was imprudent. What a fiduciary has to do is weigh information and come to a reasoned judgment, and nothing about the data suggests the fiduciaries did not do that here.[4]

At any rate, Plaintiffs cannot state a claim by merely comparing the performance of the Plan's funds and alternatives. In *CommonSpirit*, the Sixth Circuit held that plaintiffs did not plausibly state an imprudence claim by alleging that the Fidelity Freedom Index funds outperformed the Fidelity Freedom funds over a five-year period. Slip op. at 7. "[D]isappointing performance by itself does not conclusively point towards deficient decision-making," the crux of ERISA claims, and "[a]ny other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation." *Id.* at 8, 9. Here, Plaintiffs' comparison of the performance of the same funds over an even shorter 3-year period is insufficient to state a claim for the same reason.

The data alleged in the Complaint also contradicts Plaintiffs' allegations that Defendants should have replaced the Fidelity Freedom K funds with any of Plaintiffs'

---

[4] The data presented often suggests a different "winner" as between the Plan options and the proposed alternatives. For example, several of funds had higher standard deviations and higher betas than the Plan's funds (e.g., the 2035, 2040, 2045, 2050, and 2055 funds), both of which suggest "the predicted range of performance is wide, implying greater volatility." *Id.* ¶¶ 103, 106. Thus, their claim that this data shows that the Plan options "failed analysis" (whatever that means) and therefore violated the Plan's IPS is meritless as well.

proposed alternatives. Doc. 40 ¶ 106. First, Fidelity Freedom K Funds often had higher returns than Plaintiffs' alternatives over the 3-year and 5-year periods presented. This means that Plaintiffs were better off financially from the using the Freedom Funds than Plaintiffs' chosen alternatives. *See id.* (showing that the Fidelity Freedom K 2035, 2040, 2045, 2050, and 2055 funds had lower standard deviations than some of Plaintiffs' alternatives). The Plan's funds were also less or equally "sensitive[e] to market movements" than several of Plaintiffs' alternatives, meaning they were less volatile. *See id.* ¶¶ 103, 106 (showing that the Fidelity Freedom K 2025, 2030, 2035, 2040, 2045, 2050, 2055, and 2060 funds had lower or equal Beta values to some of Plaintiffs' alternatives). Plaintiffs' metrics therefore fail to give rise to a plausible inference that Defendants engaged in a deficient process.

### C.   The Complaint Does Not Plausibly Allege a Failure to Diversify.

Plaintiffs allege that the Plan's investment options were insufficiently diversified because five of the Plan's mutual funds—the Dodge and Cox Stock Fund, American Funds Growth Fund of America R6, Fidelity Balanced K, Fidelity Magellan K, and the Fidelity 500 Index—had some underlying investments that were the same and drifted in style. Doc. 40 ¶¶ 139–44. But the problem with this claim is that Plaintiffs focus their attention on only the five funds and ignore the remainder of the Plan menu. Plaintiffs thus fail to state a plausible claim for the breach of the duty to diversify.

Fiduciaries have a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses . . . ." 29 U.S.C. § 1104(a)(1)(C). To state a claim for the failure to diversify a 401(k) plan, a complaint must include allegations about the

plan's assets "as a whole, not to each investment option." *Schweitzer v. Inv. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 195–96 (5th Cir. 2020). In other words, a "narrow focus on a few individual funds, rather than the plan as [a] whole, [are] insufficient to state a claim for lack of diversification." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009). In a defined contribution plan, "fiduciaries . . . need only provide investment options that enable participants to create diversified portfolios; they need not ensure that participants actually diversify their portfolios." *Schweitzer*, 960 F.3d at 196.

The Complaint does not plausibly allege a violation of these diversification requirements. Plaintiffs do not allege that the Plan menu—which consisted of as many as 29 investment options—was not properly diversified. Nor could they; the menu contained a range of different asset types and investment types. *See, e.g.*, Ex. 3, 2018 L3 Fee Disclosure at 6–15. Even if it were appropriate to focus on just the five funds Plaintiffs challenge, the claim still fails. Plaintiffs do not dispute that each of those investment options was properly diversified, and that is all that matters. The fact that some of the options invested in a similar set of stocks does not mean that those five options were not properly diversified. Participants were free to choose into which of those options they wanted to invest, and Plaintiffs can hardly fault Defendants for providing a range of different choices. Indeed, none of the Plaintiffs even allege that they invested in a way that caused their own individual account to be non-diversified.

### D.   Plaintiffs' Recordkeeping Fees Claim is Implausible.

Plaintiffs claim that the Plan paid too much in fees for recordkeeping and

20

administrative services. The crux of Plaintiffs' claim is that the Plan's fiduciaries should have "monitor[ed] the amount of payments" and sought reductions when fees got too high. Doc. 40 ¶ 154. But judicially noticeable documents and the Complaint's allegations confirm that the Plan's fiduciaries did exactly that.

Plaintiffs allege that Plan's recordkeeping fees ranged from $68–82 per participant between 2015 and 2019, *id.* ¶ 158, and that the Plan "negotiated a lower recordkeeping cost beginning in 2020" after the Legacy L3 and Legacy Harris Plan merged, *id.* ¶ 166. Plaintiffs claim to have calculated these figures from the Plan's Form 5500s. *Id.* ¶ 165 nn.26–27. But the correct figures are shown in the Plan's recordkeeping contract with Fidelity, which this Court can consider on a motion to dismiss. *See Barrick Gold*, 2022 WL 1186532, at *3; *Tobias*, 2021 WL 4148706, at *4.

The Fidelity contract shows that, contrary to the Complaint's allegations, the Plan's fiduciaries continually obtained reductions of the Plan's recordkeeping fees. The contract with Fidelity—known as the Master Trust Agreement—was first signed in July 2012, and was amended nine times, including to continually reduce the recordkeeping fees. The original contract provided that Fidelity would be compensated through revenue sharing, rather than charging participants a per-participant fee. *See, e.g.*, Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement (Excerpt) at 1, 3. Effective January 1, 2015, before the class period starts—the contract was amended to require Fidelity to create a Participant Revenue Credit in the amount of $187,500 per quarter ($750,000 per year). *See* Ex. 9, 1/1/2015 5th Amendment to Recordkeeping Agreement at 1. The Participant Revenue Credit amounts were allocated back to

participant accounts—i.e., rebated to participants and thus reduced the revenue sharing Fidelity retained as a recordkeeping fee. *Id.*

Effective January 1, 2016, the contract was amended again, this time to increase the Participant Revenue Credit to $375,000 per quarter ($1.5 million per year). *See* Ex. 10, 1/1/2016 6th Amendment to Recordkeeping Agreement at 1. Again, this credit reduced the amount Fidelity retained as revenue sharing and the monies were rebated directly to Plan participants. In early 2018, the contract was amended yet again ███████████████████████████████████████████. *See* Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement (Excerpt) at 1, 3. First, ███████████ ████████████████████████████████████████████████████████████. *See id.* at 1. Second, effective July 1, 2018, ████████████████████████ ██████████████████████████████████████████████████ ███████████████████████. *See id.* at 3.

Once the legacy L3 and Harris plans were merged at the start of 2020, thus increasing the total number of participants, the recordkeeping fees were reduced further. The Complaint acknowledges that the fees declined in 2020 but not the new amount, Doc. 40 ¶ 166, but the recordkeeping agreement shows the new fee of █████ █████████. *See* Ex. 11, 5/1/2018 L3Harris Recordkeeping Agreement (Excerpt) at 79; Ex. 13, 12/17/2020 2d Amendment to L3Harris Recordkeeping Agreement at 2.

Not only do these facts demonstrate that the Plan's fiduciaries had a diligent process to monitor recordkeeping fees, but the Complaint confirms that the resulting fees were reasonable. In Paragraph 165, Plaintiffs include a table that lists the fees paid

in 2019 by a handful of "well managed plans" with similar numbers of participants, and it shows the range of reasonable fees was between $21 and $34 per participant. Doc. 40 ¶ 165. The Plan's recordkeeping fees were ████████████ in 2019, and then ████████████ in 2020—████████████████████████. *See* Ex. 8, 4/1/2018 8th Amendment to Recordkeeping Agreement at 1, 3; Ex. 11, 5/1/2018 L3Harris Recordkeeping Agreement (Excerpt) at 79; Ex. 13, 12/17/2020 2d Amendment to L3Harris Recordkeeping Agreement at 2. Thus, the Complaint's figures confirm that the Plan's recordkeeping fees were reasonable and consistent with other fiduciaries. Plaintiffs simply plead themselves out of court.[5]

These facts are almost identical to the ones the court found insufficient to state a claim in *Barrick Gold.* That case involved the same recordkeeper, the same use of revenue sharing to pay recordkeeping fees, the same continuous amendment of the agreement to lower fees, the same establishment of a Participant Revenue Credit that was rebated to participants, and then the same elimination of revenue sharing and

---

[5] Defendants raised these same arguments in their prior motion to dismiss and attached the same Fidelity contract and amendments. *See* Docs. 35, 35-7–35-11, 35-13. The Amended Complaint does not respond to these points. The only new allegations are quotes from a discovery stipulation Fidelity made in a different case involving Fidelity's own plan. *See* Doc. 40 ¶¶ 162–63. Fidelity stipulated to certain facts "for purposes of [that] litigation only" in exchange for plaintiffs' agreement that doing so was "in satisfaction of [Defendants'] discovery obligations." Stipulations of Fact at 2, *Moitoso v. FMR LLC*, No. 1:18-CV-12122-WGY (D. Mass. Sept. 6, 2019), ECF No. 138-67. But the stipulation does not say that Fidelity offered recordkeeping services for $14–21 per participant to every large plan it serviced; it merely states that Fidelity's own 401(k) plan "could have" obtained recordkeeping fees for those amounts. *Id.* at 3. The stipulation says nothing about what a "reasonable" recordkeeping fee was for the Plan here. *Cf. Olin*, slip op. at 9 (rejecting the use of figures from the same sources) In fact, the chart in Paragraph 165 of the Amended Complaint contradicts the discovery stipulation by showing some plans paid Fidelity $34 per participant.

switch to a per-participant fee (albeit at a much higher $68 per participant). *See Barrick Gold*, 2022 WL 1186532, at *10–13. The Court held that these same type of facts— especially the continual reductions in the recordkeeping fee—did not give rise to a plausible inference that fiduciaries violated their duty. *See id.*

Moreover, the *Barrick Gold* court considered some of the other allegations that are pled here, and also found that they did not allow for any plausible inference of imprudence. Plaintiffs here allege that the use of revenue sharing was improper, but *Barrick Gold* rejected that claim, holding that courts had concluded that use of revenue sharing was not prohibited under ERISA and instead was a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Id.* at *12 (quoting *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1081 n.1 (N.D. Cal. 2017)); *see also Olin*, slip op. at 7–8. Plaintiffs here also allege that the Plan's fiduciaries failed to obtain competitive bids at regular intervals, but *Barrick Gold* rejected that argument too, noting that courts had held that ERISA does not require such conduct. *Barrick Gold*, 2022 WL 1186532, at *12; *see also Olin*, slip op. at 9; *Del Castillo v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, No. 17-cv-7243, 2019 WL 6841222, at *5 (N.D. Cal. Dec. 16, 2019).

But this case presents an even stronger case for dismissal than *Barrick Gold,* because while plaintiffs there at least were able to allege that fees were higher than average, here Plaintiffs' own allegations show that the Plan's recordkeeping fees were not above average, and instead were ████████████████████

███. *See supra* pp. 21–23. There is no basis to infer imprudence given that the Plan's fees were in the range Plaintiffs allege was reasonable.

## II.   Plaintiffs Fail to State a Claim for the Failure to Monitor.

Count II states a failure to monitor claim against L3Harris and the L3 Board of Directors. This claim is "fully dependent on the validity of [Plaintiffs'] breach of fiduciary duty claims" and should be dismissed because Plaintiffs have failed to plausibly allege any underlying breach. *Barrick Gold*, 2022 WL 1186532, at *14; *see also Olin*, slip op. at 14; *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1286 n.20 (11th Cir. 2012); *Tobias*, 2021 WL 4148706, at *16–17. Nor have Plaintiffs alleged sufficient facts to assert an independent claim for a breach of the duty to monitor; all they have alleged is a series of legal conclusions, which is insufficient. *Compare* Doc. 40 ¶ 180, *with White I*, 2016 WL 4502808, at *19 (dismissing a failure to monitor claim where the complaint alleged similar types of legal conclusions). Thus, even if the Court were to find that Plaintiffs have alleged an underlying breach, the Court should still dismiss Count II.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court dismiss the Complaint with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), I hereby certify that the undersigned counsel has conferred with counsel for Plaintiff by telephone on June 21, 2022 in a good faith effort to resolve the issues raised herein, but were unable to reach a resolution.

Dated:  June 24, 2022

Respectfully submitted,

/s/ Mark B. Blocker
Mark B. Blocker*
Benjamin Friedman*
Sidley Austin LLP
One Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
mblocker@sidley.com
benjamin.friedman@sidley.com

Thomas A. Zehnder
Florida Bar No.: 0063274
Dustin Mauser-Claassen
Florida Bar No. 119289
KING, BLACKWELL, ZEHNDER &
WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
tzehnder@kbzwlaw.com
dmauser@kbzwlaw.com

*Admitted Pro hac vice
Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of the Notice of Electronic Filing generated by CM/ECF.

<u>/s/ Dustin Mauser-Claassen</u>
Dustin Mauser-Claassen
Florida Bar No. 119289
