## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT J. STENGL, DANIEL WILL, RONALD F. KOSEWICZ, GARY K. COLLEY, LESLIE D. DIAZ, AMAYA JOHNSON, WILLIAM A. MCKINLEY and JOHN KARIPAS, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| L3HARRIS TECHNOLOGIES, INC., THE BOARD OF DIRECTORS OF L3HARRIS TECHNOLOGIES, INC., THE INVESTMENT COMMITTEE OF L3HARRIS TECHNOLOGIES, INC. and JOHN DOES 1-30. | )<br>)<br>)<br>)<br>)<br>)<br>) |

**CASE NO:**
**6:22-cv-00572-PGB-LHP**

Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs Robert Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley, and John Karipas (collectively, the "Plaintiffs"), by and through their attorneys, and on behalf of the Plan,[1] respectfully submit this opposition to Defendants'[2] Motion to Dismiss.[3]

## I.    INTRODUCTION

Why Defendants chose to focus their brief on *Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532 (D. Utah Apr. 21, 2022) is no surprise.  It is an outlier decision, flawed in many respects, but serves Defendants' purposes to present a skewed perspective on the prevailing law.[4]  But to not address *Huang, et al. v. TriNet HR III, Inc.*, 2022 WL 93571 (M.D. Fl. Jan. 10, 2022) ("*Trinet*"), a recent decision from this court?  In *Trinet*, Judge Hernandez Covington denied a motion to dismiss a complaint alleging analogous claims as those pled in this case, and where defendants made almost identical arguments.  The court found with respect to the investment claims:

---

[1] "Plan" refers to the L3Harris Retirement Savings Plan.  Capitalized and undefined terms herein shall be ascribed the same meaning provided in the Complaint.

[2] "Defendants" refers to L3Harris Technologies, Inc. ("L3Harris"), The Board of Directors of L3Harris Technologies, Inc. (the "Board"), The Investment Committee of L3Harris Technologies, Inc. (the "Committee"), and John Does 1-30.

[3] Defendants' Motion to Dismiss Amended Complaint and Incorporated Memorandum of Law (ECF No. 43) is referred to herein as "Defs. Mem."  All references to "¶" or "Complaint" are to the Amended Class Action Complaint (ECF No. 40).

[4] The court in *Matney* relied on case law pre-dating the Supreme Court's *Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022) decision and the Central District of California's decision in *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020), which is no longer good law given that the *Marks* decision was decided by the same judge on the same basis as *Kong v. Trader Joe's Co.*, 2020 WL 7062395 (C.D. Cal. Nov. 30, 2020).  The Ninth Circuit recently reversed the *Kong* decision.  *See Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. Apr. 15, 2022).  The plaintiffs in Matney are presently appealing the decision to the Tenth Circuit.  *See Matney v. Barrick Gold of N. Am.* (10th Cir. May 20, 2022).

> In sum, the thrust of Defendants' Motion to Dismiss is that Plaintiffs' claims are factually incorrect or rely on inapt comparators and that it complied with all of its statutory obligations under ERISA. But as the Eighth Circuit has explained, 'there may well be lawful reasons appellees chose the challenged investment options [but] it is not [plaintiff's] responsibility to rebut these possibilities in his complaint[ ].' *Braden*, 588 F.3d at 596. Such factual disputes are better resolved at a later stage of the litigation.

*Trinet*, 2022 WL 93571 at * 8.  And with respect to the plaintiffs' recordkeeping claim,

the court found:

> Defendants also argue that the recordkeeping fees included in the Amended Complaint are wrong, that the Amended Complaint misconstrues the very surveys it relies on, and, moreover, 'there is no legal support for the allegation that insurance-based recordkeepers are *per se* imprudent, and it cannot be the case that 13% of plans with over $1 billion in assets (and 49.5% of all plans) have breached their fiduciary duties merely by hiring insurance-based recordkeepers.' (Id. at 22-23).

> These arguments, once again, raise factual questions that are not appropriate for this Court to resolve at the motion to dismiss stage.

*Id.* at * 9.

Following the Supreme Court's recent *Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022) decision, numerous courts have cited *Hughes* in denying motions to dismiss complaints alleging similar claims like what is alleged in the Complaint.  Here, the Plan paid far in excess of reasonable rates for a large asset value plan when looking at other comparably-sized plans.  Because the Plan was one of the largest plans in the country with over $13.5 billion dollars in assets and over 76,000 participants at the end of 2019, the Plan's fiduciaries had substantial bargaining power to negotiate and obtain some of the best pricing available in the market for Plan services.  ¶¶ 16-18.  Instead, the Plan was saddled with off-the-charts recordkeeping and administration ("RKA")

costs whether looking at direct or indirect fees or both when compared to various benchmarks.

Given this overwhelming weight of authority, many of Defendants' arguments fall flat as aptly addressed in *Trinet*.  Defendants' motion must be denied.

## II.   STANDARD OF REVIEW IN BREACH OF FIDUCIARY DUTY ACTIONS

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff."  *Martinex Claros v. Taylor Lee & Asso., LLC*, 2018 WL 7079995, at *2 (N.D. Ga. Sept. 18, 2018) (citing *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012)).

Courts recognize that in cases alleging imprudent fiduciary process, "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident."  *Henderson v. Emory Univ.*, 252 F.Supp.3d 1344, 1325-6 (N.D. Ga. 2017) (citation omitted); *see also Trinet*, 2022 WL 93571 at * 7 ("While Defendants take issue with the fact that Plaintiffs have not pointed to any

specific flaw in their decision-making process, the Court is persuaded that the Plaintiffs need not do so at this stage of the litigation").

The Supreme Court's recent decision in *Hughes v. Northwestern Univ.*, reinforces the above pleading standard. *Hughes* vacated a decision that was at odds with the Third and Eighth Circuit's decisions in *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320 (3d Cir. 2019) and *Davis, et al. v. Washington U.*, 960 F.3d 478 (8th Cir. 2020)*. See* Br. for the United States as Amicus Curiae at 17, *Hughes v. Northwestern Univ.*, No. 19-1401 (May 25, 2021)[5] ("the decision below conflicts with decisions of the Third and Eighth Circuits, both of which have held that very similar complaints—alleging that defendants offered retail-class investment shares instead of available institutional-class shares, and paid excessive recordkeeping fees in universities' Section 403(b) plans— stated claims for relief under ERISA.")

Additionally, *Hughes* implores lower courts to apply the teachings of *Tibble v. Edison Int'l*, 575 U.S. 523, 529-530 (2015) where the Supreme Court "interpreted ERISA's duty of prudence in light of the common law of trusts and determined that 'a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.'" *Hughes*, 142 S.Ct. at 741  (quoting *Tibble*, 575 U.S. at 530). This duty includes controlling plan costs. *See* Complaint, ¶ 10 (citing Uniform Prudent Investor Act, § 7).  Lastly, the dicta in *Hughes* that lower courts must give consideration of "reasonable judgments a fiduciary may make" at best suggests the scope of

---

[5]https://www.supremecourt.gov/DocketPDF/19/19-1401/180105/20210525160954238_19-1401%20Hughes%20-%20US%20invitation%20brief%20final.pdf

"judgments" ought to be taken up at summary judgment.

Several courts, like the recent *Moler, et al. v. Univ. of Maryland et al.*, No. 1:21-cv-01824 (D.Md. July 13, 2022) (attached to Gyandoh Decl. as Ex. 1) and *Coviello v. BHS Mgmt. Servs., Inc., et al.*, No. 3:20-cv-30198-MGM (ECF No. 77) (D. Mass. June 9, 2022) (attached hereto as Gyandoh Ex. 2) decisions, have relied on *Hughes* either directly or indirectly to deny motions to dismiss claims analogous to those alleged here. *See also Moore et al. v. Humana, Inc. et al.*, No. 3:21-cv-00232-RG, slip op. (W.D.Ky. Mar. 31, 2022) (attached to Gyandoh Decl. as Ex. 3) (upholding allegations of excessive recordkeeping and administration costs where "Plaintiffs include a chart comparing similarly situated plans, including a comparison of number of participants, amount of assets, and recordkeeping fees paid."); *Johnson et al. v. The PNC Financial Services Group, Inc. et al.*, No. 2:20-CV-01493, slip op. at 8 (W.D. Pa. Mar. 31, 2022) (attached to Gyandoh Decl. as Ex. 4) (upholding excessive recordkeeping and administrative cost claims); *Smith et al. v. VCA, Inc., et al.,* No. 21-9140-GW-AGRx, at *6 (C.D. Cal. Apr. 6, 2022) (attached to Gyandoh Decl. as Ex. 5) (same); *Goodman v. Columbus Regional Healthcare Sys., Inc.*, 2022 WL 228764, at *3 (M.D. Ga. Jan. 25, 2022) (alleging that defendant's "recordkeeper received fees that were nearly double what a reasonable recordkeeping fee would have been for a similarly sized ERISA plan" and that the "recordkeeper received additional indirect compensation that was excessive and should have been more carefully scrutinized by a prudent plan fiduciary."); *Shaw v. Quad/Graphics, Inc.,* 2022 WL 227502, at *1 (E.D. Wis. Jan. 26,

2022) (denying defendants' motion to dismiss in light of the *Hughes* decision); *Bangalore v. Froedtert Health, Inc.*, 2022 WL 227236, at *1 (E.D. Wis. Jan. 26, 2022) (same).

The Sixth Circuit recently went against the grain in affirming dismissal of the plaintiff's claim in *Smith v. Commonspirit Health*, 37 F.4th 1160 (6th Cir. 2022). However, an even more recent decision from the Sixth Circuit, *Forman v. TriHealth, Inc.*, --- F.4th ----, 2022 WL 2708993 (6th Cir. July 13, 2022), noted that in "*Hughes v. Northwestern University*, **the Supreme Court rejected a bright line rule**, derived from *Hecker* and *Loomis*, that a broad menu of funds could itself defeat an imprudence claim premised on one particular offering that performed poorly or had high fees." *Id.* 2022 WL 2708993, at *6 (citing 142 S. Ct. at 742) (emphasis added). *TriHealth* demonstrates that the Sixth Circuit did not intend to create any bright line rule in *CommonSpirit* that would deny plaintiffs the ability to state a claim for excessively investment options.

## III.   STATEMENT OF FACTS[6]

### A. Overview of the Plan

---

[6] Defendants ask this Court to take judicial notice of over 200 pages of documents. A court may only take notice of certain facts without formal proof when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). The Eleventh Circuit recognizes judicial notice as "a highly limited process" that requires caution because "the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). *See Trinet*, 2022 WL 93571 at * 4 ("And the Court further declines to take judicial notice of nearly 1,000 pages of submitted documents."); *Moler, et al. v. Univ. of Maryland et al.*, No. 1:21-cv-01824, ECF 49 (D.Md. July 13, 2022) (granting motion to strike extraneous documents).

During the putative Class Period, the Plan had at least 50,000 participants. ¶ 158. At the end of 2019, the Plan had 76,208 participants and $13,582,463,721 assets under management for all funds. ¶¶ 59, 62. From 2015 to 2019, the Plan's assets under management ranged from more than $4.5 billion dollars to $13.5 billion dollars. ¶ 59.

### B. The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

Measured by several different benchmarks, during the Class Period Defendants breached the duties they owed to the Plan.

### 1. Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

One indication of the Plan's poor management was the fiduciaries' selection of expensive funds for the Plan. ¶ 75. Taking one year of the Class Period as an example, in 2019, the expense ratios for several funds in the Plan were more expensive than comparable funds found in similarly sized plans (plans having over 1 billion dollars in assets). ¶ 78. In fact, the majority of funds in the Plan had expense ratios well above the median and average expense ratios for similarly sized plans. *Id.* In some cases, expense ratios were up to *71%* (in the case of the Fidelity Balanced K) and a *60%* difference (in the case of the Fidelity Freedom 2060 K Fund) above the median expense ratios in the same category. ¶ 79.

### 2. Several of the Plan's Funds With Substantial Assets Were Not in the Lowest Fee Share Class Available to the Plan

During the Class Period, Defendants failed to identify and utilize available lower-cost share classes for many of the Plan's funds.  ¶ 83.  The lower cost funds were identical in all ways except price and cost anywhere from *13.51%* (in the case of the Fidelity Freedom K and Fidelity Freedom 2005 K funds) to *30.00%* (in the case of the Fidelity Freedom 2040 K, Fidelity Freedom 2045 K, Fidelity Freedom 2050 K, Fidelity Freedom 2055 K, and Fidelity Freedom 2060 K funds) less than the funds selected and maintained in the Plan by Defendants.  *Id.* at ¶ 86.  The Plan's assets under management for all of these funds from 2017 to 2019 was over $1.1 billion thus easily qualifying them for lower share classes.  *Id.*  Defendants' failure to select these cheaper identical funds reduced the likelihood that Plan participants achieve their preferred lifestyle in retirement.  *Id.* at ¶ 88.

### 3.  Failure to Investigate Availability of Lower Cost Collective Trusts

Another indication of Defendants' imprudent process was Defendants' failure to consider and select materially similar but cheaper, collective investment trusts (CITs).  *Id.* at ¶ 92.  CITs "are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less."  *Id.*  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified that the Fidelity Diversified International Fund and the Fidelity Magellan funds, which harbored more than $300 million dollars in assets under management as of 2019, were available as CITs.  *Id.* at ¶ 97.  Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to

8

mutual funds, in order to negotiate the best possible price for the Plan.  *Id.* at ¶ 100.
By failing to investigate the use of alternative investments such as collective trusts,
Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  *Id.*

### 4. Defendants Failed to Utilize the Tools of Modern Portfolio Theory in Selecting the Best Investments for the Plan

Prudent portfolio managers use the Modern Portfolio Theory (MPT) to identify
funds that have a similar Risk/Return footprint to alternative, less expensive, better
performing funds whether those alternative funds may be collective investment trusts,
separate pooled accounts or alternative mutual funds.  *Id.* at ¶ 105.  Here, the funds in
the Plan remained largely unchanged since 2015, strongly suggesting that the Plan's
fiduciaries failed to use MPT or any other acceptable alternative to evaluate and
replace funds in the Plan.  *Id.*

### 5. The Committee Violated the Plan's Investment Policy Statement

According to the Plan's Investment Policy Statement (IPS), the Committee has
the responsibility to "[e]stablish, and modify, as appropriate, the investment policies
for the Plan and the investment objectives and performance goals for the management
of Plan investment options, and monitor the performance of investment options
against performance criteria…"  *Id.* at ¶ 113 (IPS at 3).  Yet, the Committee permitted
funds to remain in the Plan that had been outperformed as long as ten years.  *Id.* at ¶
114.  Additionally, the Committee selected actively managed funds over passively
managed funds which was inconsistent with their obligations under the
aforementioned provision.  *Id.*

### 6. The Plan Consistently Favored Actively Managed Funds when Passive Funds Outperformed them by a Significant Margin

While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term. *Id.* at ¶ 116. Throughout the Class Period, at least 80% of the funds in the Plan were actively managed funds showing that the Committee's process in selecting funds must have been deficient. *Id.* at ¶ 133. Defendants' actions in overwhelmingly favoring actively managed funds, plausibly shows that they failed to consider the pros and cons of offering actively managed investments vs. passively managed investments. *Id.* at ¶ 132. As such, Defendants' failure to investigate lower cost passive alternative investments during the Class Period cost the Plan and its participants millions of dollars. *Id.* at ¶ 135.

### 7. The Plan Lacked Diversification and Created Additional Concentration Risk, High Correlation, Higher Volatility, and Had Poor Security Selection

During the Class Period, Defendants selected and retained five options that produced concentrated risk, added high correlation, higher volatility, and poor security. *Id.* at ¶ 144. Had the Committee engaged in an appropriate process for selecting funds for the Plan, it would not have chosen funds that deprived plan participants of any meaningful large cap investment to diversify their portfolio. *Id.*

### 8. The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

The Plan's recordkeeper during the Class Period is/was Fidelity. ¶ 157. Plans with large numbers of participants can take advantage of economies of scale and

negotiate a lower per-participant recordkeeping fee.  *Id.*  During the Class Period, the Plan's per participant administrative and recordkeeping fees were astronomical for the Plan's size:

| Year | Participants | Direct Cost | Indirect Cost[7] | Total Cost | $PP |
|------|--------------|-------------|------------------|------------|-----|
| **2015** | 50,000[8] | None Reported | $3,415,979 | $3,415,979 | $68.32 |
| **2016** | 50,997 | None Reported | $3,541,926 | $3,541,926 | $69.45 |
| **2017** | 50,327 | None Reported | $4,148,222 | $4,148,222 | $82.43 |
| **2018** | 47,853 | None Reported | $3,457,338 | $3,457,338 | $72.25 |
| **2019** | 76,240 | $1,329,911 | $4,083,413 | $5,413,324 | $71.00 |

¶ 158.

Looking at recordkeeping costs for other plans of a similar size as of 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.  *Id.* at ¶ 165 (listing eight comparably sized plans – plans having over 30,000 participants and approximately $3 billion dollars in

---

[7] Indirect costs are estimated but are likely conservative. Discovery may reveal additional sources of revenue sharing which will drive the per participant costs even higher. The indirect costs reported are derived from the Form 5500s and know revenue sharing amounts for specific funds in the Plan. When using the 5500s only amounts coded as 15, 21, 36, 37, 38 and 50 were used. These codes refer to recordkeeping and administrative costs. Although, the 2019 Auditor Report indicates that some of this amount may have been paid back to the Plan, it's not clear exactly how much and how and when it was applied. 2019 Auditor Report at 6.

[8] The number of participants for 2015 is estimated as the Plan's 2015 5500 did not include the number of participants with account balances at the end of the year.

assets under management – that paid per participant recordkeeping fees ranging from $21 to $34).

## IV.   ARGUMENT

### A. Defendants Breached Their Duty of Prudence By Implementing A Flawed Process for Selecting the Plan's Investment Options

#### 1.   Defendants Breached Their Fiduciary Duty By Maintaining Higher Cost Underperforming Funds When Lower Cost Better Performing Alternatives were Available

Defendants give short shrift to Plaintiffs' claim that Defendants failed to offer available identical lower-cost alternatives to some of the Plan's investments.  Defs. Mem. at 8-10.  That is because the law is not on their side.  First, this is precisely the type of claim the Supreme Court upheld in *Hughes*.  *See Hughes,* 142 S. Ct. at 741 (Court upheld plaintiffs' allegation that the plan fiduciaries "neglect[ed] to provide cheaper and otherwise-identical alternative investments.").   Second,  courts  within  the Eleventh Circuit have held, "plaintiffs have properly stated a claim that choosing retail-class shares over institutional-class shares is imprudent."   *Henderson*, 252 F.Supp.3d at 1350-51 ("the plaintiffs allege that the defendants did not use their bargaining power to obtain the lower cost fees and that the lower cost options are the exact same as the higher cost shares except for the actual fees charged. The plaintiffs assert that no reasonable fiduciary would choose or be complacent with being provided retail-class shares over institutional-class shares."); *Pledger v. Reliance Trust Co.*, 240 F.Supp.3d 1314, 1331-32 (N.D. Ga. 2017) (same), *TriNet*, 2022 WL 93571, at *5-6 (same).

Most "[c]ourts examining this issue have concluded that investment in a retail class fund where an identical institutional class fund with lower fees is available can violate the duty of prudence." *Disselkamp v. Norton Healthcare, Inc.,* 2019 WL 3536038, at * 4 (W.D. Ky. Aug. 2, 2019); *See also Johnson v. Fujitsu Tech. and Bus. Of Am., Inc.*, 250 F. Supp.3d 460, 466-67 (N.D. Cal. 2017) (holding that plaintiffs' allegations regarding share classes supported a claim for breach of fiduciary duty); *Johnson v. Providence Health Sevs. et al.*, 2018 WL 1427421, at * 5 (W.D. Wash. Mar. 22, 2018) (upholding claim where "Plaintiff argue[d] that Defendants' inclusion of specific retail shares of funds was imprudent because there were identical, lower-cost institutional shares available."). Failure to gain access to cheaper identical or materially similar funds given a plan's substantial size is a "failure of effort [or] competence" and "is enough to state a claim for breach of the duty of prudence." *Davis, et al. v. Washington U.*, 960 F.3d 478, 483 (8th Cir. 2020). Given the fee discrepancies of up to 30.00% between the funds selected by the Defendants and the cheaper ones available, Defendants' decision cost Plan participants millions of dollars. ¶ 86.

Defendants attempt to justify their imprudence in selecting the higher cost version of K share funds by arguing the suite of funds offered within the Plan provided revenue sharing. Defs. Mem. at 8-10. This argument is easily addressed. Defendants in Trinet similarly argued "the difference in cost of the remaining three investments is attributable to permissible revenue sharing." *Trinet*, 2022 WL 93571 at * 5. Rejecting that argument, the court stated "[t]he only question before the Court is whether Plaintiffs have pled sufficient facts, taken as true, that meet the requisite pleading

13

standard. Plaintiffs have met that burden here.")  Id. at *6.  While Plaintiffs acknowledge the practice of revenue sharing is not per se improper, "revenue sharing […] unchecked, … is devastating to Plan participants."  ¶ 153.  The Ninth Circuit recently rejected defendants' efforts to rely on revenue sharing in an attempt to justify the use of the more expensive funds finding, "Defendants' explanation for the more expensive choice is unavailable at the pleading stage."  *Kong et al. v. Trader Joe's Company et al.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022); *Davis et al. v. Salesforce.com et al.,* 2022 WL 1055557, at *1 (9th Cir. April 8, 2022) ("That explanation is plausible, and defendants may well be able to substantiate it at the summary judgment stage."); see also *Forman v. TriHealth, Inc.*, --- F.4th ----, 2022 WL 2708993, at * 7 (6th Cir. July 13, 2022)  ("The theory merely provides a competing inference for why TriHealth offered retail-class funds. Revenue sharing remains 'one plausible inference, but it is not the only one.'" (quoting Davis, 960 F.3d at 483).

Further, in *TriNet* the court in upholding plaintiffs' lower share class claim found, "Plaintiffs have alleged that TriNet's decision-making process in managing the Plans was tainted by imprudence because the decision-making process, or lack of oversight thereof, allowed for the retention of poorly performing investments and investments that charged excessively high fees when other options were available to the Plans".  2022 WL 93571, at *7.[9]

_____

[9]  For that reason, the court's analysis in *White v. Chevron Corp.*, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) ("*White II*") is incompatible with prevailing case law. Moreover, *White v. Chevron*, is distinguishable from the instant case because "unlike the plaintiff in *White*, [plaintiffs] do[] not challenge the overall investment lineup."

## 2. Under the Prevailing Circumstances, Defendants Were Required to Investigate the Prudence of Offering Other Lower Cost, Better Performing Investment Options

Defendants misunderstand the Complaint's allegations regarding Defendants' failure to investigate lower cost CITs.  Defs. Mem. at 10-12.  The thrust of the allegations is that the Defendants failed to investigate whether the selected funds could be replaced with comparable, lower cost alternatives (Complaint, ¶¶ 91-99, 92-100). *See Salesforce.com,* 2022 WL 1055557, at * 2 ("Plaintiffs have also adequately alleged, in the alternative, that defendants imprudently failed to investigate and timely switch to available collective investment trusts, which plaintiffs allege had "the same underlying investments and asset allocations as their mutual fund counterparts" but had better annual returns and a lower net expense ratio."); *see also Trinet,* 2022 WL 93571 at * 7 ("Plaintiffs have alleged that TriNet's decision-making process in managing the Plans was tainted by imprudence because the decision-making process, or lack of oversight thereof, allowed for the retention of poorly performing investments and investments that charged excessively high fees when other options were available to the Plans.").

## 3. The Other Alleged Indicia of Imprudence Considered Together Leads to An Inference that the Plan Fiduciaries Engaged in an Imprudent Fund Monitoring Process

---

*Lorenz et al. v. Safeway,* 241 F.Supp.3d 1005, 1023 (N.D. Cal. 2017).  Plaintiffs only challenge a subset of the Plan's funds.

i.      **The Fee and Performance Benchmarks For the Plan's Funds are Plausibly Alleged**

As a threshold matter, the Complaint compares the Plans' imprudent investment options with other nearly identical investments available on the market to the same benchmarks as a way to demonstrate the overall lack of prudent investment management displayed by the Plans' fiduciaries.  In *Trinet*, "Defendants argue[d] that Plaintiffs' chosen benchmarks of measuring the funds' performance or their expense ratios is insufficient or inapt. (Doc. # 29 at 12-13, 18 n.35)."  *Trinet*, 2022 WL 93571 at * 8.  As the court noted, however "the appropriate benchmarking period is a factual dispute that cannot be resolved at the motion-to-dismiss stage."  *Id.*

ii.     **The ICI Chart is a Useful Measurement**

Defendants question the usefulness of the Complaint's utilization of median and average fee comparisons.  Defs. Mem. at 14-16.  Their argument is meritless.  The median and average cost comparisons charts highlight a glaring failure in the Plans' fiduciaries' investment selection and monitoring process.  The fact that some of the Plans' funds had expense ratios that exceeded comparable funds by as much as 71% in some instances, ¶ 79, plausibly demonstrates imprudent conduct.[10]  Had the Plan's fiduciaries faithfully executed their fiduciary duties, the expectation would be the expense ratios for the majority of the Plan's funds would be at or below the median

---

[10] Unlike in *Davis v. Washington Univ. in St. Louis*, Plaintiffs here have not "simply ma[de] a bare allegation that costs are too high, or returns are too low." *Davis*, 960 F.3d at 484.  Rather, Plaintiffs' here have alleged comparisons to the ICI Chart and performance benchmarks, which are just the "sound basis for comparison – a meaningful benchmark" the Eighth Circuit required for an investment-by-investment challenge in *Meiners*, 898 F.3d 820 at 822.

and average prices similarly situated plans paid.  Instead, the opposite was true.  And the fact that the ICI uses composite fee data, Defs. Mem. at 14-16, is insufficient to account for the significant discrepancy between the Plan's fund fees and the median and average fund fees.[11]

Notwithstanding Defendants' criticism of the use of the ICI median and averages charts, several courts have upheld claims based in part on the chart.[12]  *See TriNet*, 2022 WL 93571, at *1, 5-8 (upholding prudence claim when plaintiffs alleged "the expense ratios for many funds in the Plans greatly excessed the ICI Median"); *Silva v. Evonik Corp.*, 2020 U.S. Dist. LEXIS 250206, at *13 (D.N.J. Dec. 30, 2020) ("Plaintiffs allege that most of the investment options in the Plan charged higher-than-average fees, with reference to median fees published by the Investment Company Institute and the fees of alleged comparators."); *Pinnell v. Teva Pharmaceuticals USA, Inc.*, 2020 WL 1531870 at * 5 (E.D. Pa. Mar. 31, 2020) ("[Plaintiffs] included three

---

[11] The claims in *Anderson v. Intel Corp.*, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021) differed substantially from the facts set forth by Plaintiffs here.  In *Anderson*, the "Plaintiffs acknowledge[d] that they have not alleged that any specific investment in a hedge fund or private equity fund made by the Investment Committee was imprudent."  *Anderson*, 2021 WL 229235, at *6.  Here, Plaintiffs allege it was imprudent to select a more expensive version of the ***same*** or near same fund when the cheaper fund was available.  In *Anderson*, Plaintiffs alleged only that the funds in the plan were subject to fees "significantly higher than those charged by funds with *comparable* investment styles and similar or better performance."  *Anderson*, 2021 WL 229235, at *8 (emphasis added).  Thus, *Anderson* is not instructive as to the adequacy of Plaintiffs' claims here.

[12] Defendants draw the Court's attention to *Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018), a case that involved allegations having nothing at all to do with a claim for excessive recordkeeping and administrative fees.  As the First Circuit noted "none of the cases on which the plaintiffs rely passed **on the question presented here**: whether allegations that a stable value fund invested a relatively high proportion of its assets in cash or cash-equivalents, and that such a 'cash' allocation departed radically from the logic and practices of such funds, suffice in combination to state a claim of imprudence under ERISA."  *Id.* at 50 (emphasis added).

tables comparing investment options offered by the Plan to similar or identical lower-fee alternatives and comparing expense ratios to median fees in the same category); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385, at * 2 (S.D. Cal. June 24, 2020) ("the Plan's investment expenses were higher than industry averages: at least 18 of the 20 mutual funds offered in 2016 had above-average expenses."); *see generally McCool v. AHS Mgmt. Company, Inc.*, 2021 WL 826756 (M.D. Tenn. Mar. 4, 2020) (upholding allegations based on ICI median charts); *Davis v. Magna Int'l. of Am., Inc.*, 2021 WL 1212579, at *7 (E.D. Mich. Mar. 31, 2021) (court rejected defendants challenges of the ICI study finding "[t]o the extent that Defendants argue the merits of Plaintiffs' comparisons, such arguments are premature in a motion to dismiss").

### iii. Plaintiffs' Performance Benchmarks and Reliance on the Modern Portfolio Theory (MPT) Are Plausibly Alleged

Similarly, Defendants argue Plaintiffs failed to allege the Plan funds underperformed. Defs. Mem. at 17. Simply put, Defendants' argument (and case law they rely on) is based on their contention that the MPT was not, in fact, comparable. In *Nicolas*, the court remarked that "Defendant raises factual questions about whether the alternative funds Plaintiff suggests ... are apt comparisons—and, therefore, whether the underperformance Plaintiff depicts is an accurate portrait ... Such questions do not warrant dismissal—to the contrary, they suggest the need for further information from both parties." 2017 WL 4455897, at * 5; *Cryer v. Franklin Templeton Resources Inc.*, 2017 WL 818788, at *4 (N.D. Cal. Jan. 17, 2017) (same); *see also Main v. Am. Airlines, Inc.*, 248 F.Supp.3d 786, 794 (N.D. Tex. 2017) (upholding similar

allegations); *Pinnell*, 2020 WL 1531870, at * 1 (upholding similar allegations); *Trinet*, 2022 WL 93571 at * 8.[13]

Further, Defendants' urge this Court to "defer to reasonable fiduciary judgments," Defs. Mem. at 17, but fiduciaries are required to continually monitor a plan's funds for evidence of imprudence. *Tibble*, 135 S. Ct. at 1828-29.  It makes little sense to say, as Defendants do, that five years is an insufficient amount of time to evaluate the prudence of an investment.  Such a finding would undercut the Supreme Court's decision in *Tibble*.[14]

### iv.   Offering An Array of Different Investment Options Does Not Cure Breaches of Fiduciary Duty

Defendants' argument that the Plan offered diverse investment options sidesteps the gravamen of Plaintiffs' allegations.  Defs. Mem. at 4, 20.[15]  First, arguing that the

---

[13] Defendants' reliance on *White v. Chevron Corp.*, 2017 WL 2352137 (N.D. Cal. May 31, 2017), is misplaced as the court's analysis there is incompatible with prevailing case law, including *Hughes*. Moreover, *White v. Chevron*, is distinguishable from the instant case because "unlike the plaintiff in *White*, [plaintiffs] do[] not challenge the overall investment lineup." *Lorenz v. Safeway*, 241 F. Supp. 3d 1005, 1023 (N.D. Cal. 2017). Plaintiffs only challenge a subset of the Plan's funds.  Plaintiffs have clearly alleged more than just "[p]oor performance," in contrast to the allegations in *White.  See White*, 2017 WL 2352137, at *1.

[14] *See also Assembling a Robust Investment Policy Statement for Endowments and Foundations*, THE PNC FINANCIAL SERVICES GROUP, INC., Jan. 8, 2020 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-five year period)"), *available   at*   https://www.pnc.com/insights/corporate-institutional/manage-assets/assembling-a-robust-investment-policy-statement-for-endowments-foundations.html; *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (advisor satisfied fiduciary duty where it regularly presented "three and five-year benchmarks" of investment options); *New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1361 (N.D. Ga. 2009) (similar).

[15] In *Young v. General Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009), the plaintiffs challenged the lack of diversity among "a few individual funds, rather than the plan as a whole." Here, Plaintiffs are challenging the Plan as a whole.

Plan "offered a range of investments does not automatically mean that Defendant was a prudent fiduciary." *McNeilly*, No. 1:20-cv-870, at 17 (citing *Sweda*, 923 F.3d at 329. To find as such "would effectively insulate all fiduciaries that offer a range of investments." *Id*. at 17.  Indeed, the basis for the Supreme Court reversing and in remanding the Hughes matter was precisely because it found the Seventh Circuit erred in finding that offering a diverse range of options insulted the plan's fiduciaries from a violation of ERISA.  The Supreme Court rejected the arguments of the respondents and held "[t]he Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents." *Id.* , 142 S.Ct. at 742.

### B.  Defendants Breached Their Fiduciary Duties in Failing to Monitor the Plan's Recordkeeping Fees

#### 1.  Defendants Failed to Adequately Stay Informed About Overall Trends in the Market Place Regarding Recordkeeping Fees

It was critically important for the Plan's fiduciaries to both conduct RFPs in this case and leverage the Plan's asset size and total number of participants to bargain for reasonable per participant recordkeeping and administrative costs beginning at the start of the Class Period. ¶ 157.  Specifically, this would have allowed the Plan's participants to determine whether they were obtaining the best rates from Fidelity. *Bell v. Pension Comm. of ATH Holding Company, LLC*, 2017 WL 1091248 at * 5 (S.D. Ind. March 23, 2017) (finding "that Plaintiffs were not required to allege that the recordkeeping fees were the result of any type of self-dealing, but were required to

assert only that Defendants failed to act with prudence under § 1104 when failing to solicit bids and to monitor and control recordkeeping fees."); *Short v. Brown U.*, 320 F.Supp.3d 363, 370 (D.R.I. July 11, 2018) ("Plaintiffs' claim that a prudent fiduciary in like circumstances would have solicited competitive bids plausibly alleges a breach of the duty of prudence."); *Ramos v. Banner Health*, 2017 WL 4337598, at * 3 (D. Colo. Sept. 29, 2017) (upholding claims defendant "failed to engage in a competitive bidding process in retaining Fidelity as the Plan's recordkeeper."); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799-800 (7th Cir. 2011) (finding plausible plaintiffs' argument that "defendants' failure to solicit bids caused them to overpay Hewitt by at least $16 per participant per year.").[16]

### 2. Any Miscalculation of Feeds in the Complaint Are Inconsequential

Defendants take issue with Plaintiffs' calculation of the RKA costs and attempt to inject numerous extraneous facts regarding their contract negotiations with Fidelity. Defs. Mem. at 20-25. As an initial matter, minor errors in calculation does not defeat otherwise well-pled claims. *TriNet*, 2022 WL 93571, at *5-6 (rejecting defendants' arguments regarding the accuracy of the plaintiffs' alleged fee information finding "[t]he arguments raised by Defendants implicate fact issues that are not appropriate for resolution on a motion to dismiss"); *Pinnell*, 2020 WL 1531870, at * 6 (court upheld

---

[16] *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty. Inc.*, 2019 WL 6841222, at * 1 (N.D. Cal. Dec. 16, 2019) is not on point because the alleged failure to send out requests for proposals was related to "life annuity contracts" and "consulting services to" plan participants, and not recordkeeping contracts. The difference is that recordkeeping is a highly competitive business because nearly all recordkeepers in the marketplace offer the same range of services.

plaintiffs' excessive recordkeeping fee "despite the participants' initial miscalculation based on lack of information"); *Silva*, 2020 U.S. Dist. LEXIS 250206, at *14 (same). Even adjusting for any supposed miscalculations on the part of the Plaintiffs still shows the Plan was overpaying for RKA because it was still above the figure of the low $20 range Plaintiffs allege was available to the Plan.  So, adjusting for any mistakes, which Plaintiffs do not concede, still does not save Defendants.  Whether Defendants dispute fees and costs as taken from the Form 5500s only stresses the fact there are disputes of fact in this action that cannot be resolved at this stage.[17]   *Sweda*, 923 F.3d at 329.

Importantly, the Complaint's allegations are enough to put Defendants on notice that Plaintiffs allege they overpaid for RKA.  *See Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *7 (D.N.D. Dec. 10, 2021) (applying Fed. R. Civ. P. 8(a)(2)'s requirement that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to analogous ERISA breach of fiduciary duty case); *Williams v. Centerra Group, LLC*, 2021 WL 4227384, at *2 (D.S.C. Sept. 16, 2021) (same); *Stark v. Keycorp*, 2021 WL 1758269, at *4 (N.D. Ohio May 4, 2021) (same); *Peterson v. Ins. Servs. Office, Inc.*, 2021 WL 1382168, at *2 (D.N.J. April 13, 2021) (same).  No more pleading is required to put Defendants on notice as to the claims against them.

---

[17] To the extent that Plaintiffs made any errors of fact regarding the recordkeeping fee amounts as Defendants argue, it was due to Plaintiffs' lack of access to accurate Plan data from the Plan's publicly filed form 5500s at the time of filing their Complaint and does not warrant dismissal.  *See Pinnell,* 2020 WL 1531870, at * 6 ("The participants also alleged excessive recordkeeping fees, a plausible allegation despite the participants' initial miscalculation based on lack of information.").

### 3.  The Plan's Recordkeeping Fees Were Excessive Based on Market Comparisons

Defendants' challenge to Plaintiffs' choice of comparators raises issues of fact that require assessment on a more developed record.  *See McCool*, 2021WL 826756, at *5 ("the appropriate inquiry on these claims involves issues of fact, which cannot be determined on a motion to dismiss").  *See also Humana*, No. 3:21-cv-00232-RGJ (ECF No. 39), at *7-8 (finding plaintiffs' allegations that defendants paid significantly more for recordkeeping than comparable plans were "enough to survive a motion to dismiss"); *Cassell v. Vanderbilt*, 285 F.Supp.3d 1056, 1064 (M.D. Tenn. 2018) ("[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss.")

Plaintiffs pled numerous examples of market comparisons and reasonable fee benchmarks to support the claims the Plan's recordkeeping fees were excessive.  ¶¶ 159-167.  Plaintiffs cite to the recordkeeping costs for seven comparably sized plans (plans having more than 30,000 participants and approximately $3 billion dollars in assets under management), which demonstrate that as of 2019, the Plan was paying higher recordkeeping fees than its peers.  ¶ 165. The per participant recordkeeping fees for these comparable plans ranged from $22 to $34, which is far less than the participants paid to Principal in this Plan.  *Id.*  These allegations add up to a plausible claim for fiduciary failures.  *See, e.g., PNC*, No. 2:20-CV-01493, at *11 (upholding recordkeeping fee claims when "Plaintiffs allege that the Plan's average per participant, per year recordkeeping fee of $52.58 is "unreasonable and excessive

relative to the services received[,]" especially when compared to the four other 401(k) plans noted within the Plaintiffs' benchmark table."); *Smith et al. v. VCA, Inc., et al.*, No. 21-9140-GW-AGRx, at *6 (C.D. Cal. Apr. 6, 2022) (attached to Gyandoh Decl. as Ex. 5) (denying motion to dismiss recordkeeping fee claim when, "In defense of their position that such a fee is unreasonable, Plaintiffs provide a table of 'per participant retirement plan service fees' for other comparable plans with similar numbers of participants. *Id.* ¶ 129. The table at Plaintiffs' Complaint ¶ 129 indicates that Plaintiffs alleged comparable plans have recordkeeping services fees between $28 to $49.").

The recent *Moitoso* lawsuit discussed in the Complaint, where Fidelity's multi-billion dollar plan with over fifty thousand participants — like the Plan — was sued is highly informative. The "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020); *see also* ¶¶ 161-162.

Fidelity's stipulation is quite informative because Fidelity is the Plan's recordkeeper here. Accordingly, the Fidelity stipulation plausibly suggests in 2017 the value in the marketplace of the type of services provided to the Plan would only have been $14 per participant for a plan with around fifty thousand participants (the size of the Fidelity plan). ¶ 97. In 2017, the Plan had 32,590 participants with account

balances, which ballooned to 63,066 participants in 2020. ¶ 91. Defendants' argument that Fidelity's stipulation in *Moitoso* is unrelated to this case is unavailing. Defs. Mem. at 10-11. Of course the stipulation is relevant because it is context-specific and adds to the plausible allegations that this Plan, which also hired Fidelity as a recordkeeper, was paying more for RKA than Fidelity thought it should be paying. If nothing else, these are issues that deserve further exploration in discovery.

### C. The Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor

Like the defendants in *Karg v. Transamerica Corp.*, Defendants argue Plaintiffs' failure to monitor claim fails because the underlying imprudent management claim fails. Defs. Mem. at 25. This is of no moment, because Plaintiffs "have pleaded the underlying fiduciary breach necessary to support their failure to monitor claim." *Karg*, 2019 WL 3938471, at * 9.

## V.    CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety or, alternatively, grant Plaintiffs' an opportunity to amend the Complaint.

Dated: July 15, 2022                    **MATTHEW FORNARO, P.A.**

*/s/ Mathew Fornaro*
Matthew Fornaro, Esq.
FL ID #650641
Matthew Fornaro P.A.
11555 Heron Bay Boulevard
Suite 200
Coral Springs, FL  33076
Telephone: (954) 324-3651

Fax: (954) 248-2099
mfornaro@fornarolegal.com


*/s/ Donald R. Reavey, Esq.*
Donald R. Reavey, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
 donr@capozziadler.com
Telephone: (717) 233-4101
Fax: (717) 233-4103


*/s/ Mark K. Gyandoh, Esq.*
Mark K. Gyandoh, Esquire
Gabrielle Kelerchian, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
PA Attorney ID # 324248
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103


Counsel for Plaintiffs and the Putative Class

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all attorneys of record.

*/s/Mark K. Gyandoh* _____