## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ROBERT J. STENGL, DANIEL WILL, RONALD F. KOSEWICZ, GARY K. COLLEY, LESLIE D. DIAZ, AMAYA JOHNSON, WILLIAM A. MCKINLEY and JOHN KARIPAS,**

                **Plaintiffs,**

**v.**                                  **Case No: 6:22-cv-572-PGB-LHP**

**L3HARRIS TECHNOLOGIES, INC., THE BOARD OF DIRECTORS OF L3HARRIS TECHNOLOGIES, INC. and THE INVESTMENT COMMITTEE OF L3HARRIS TECHNOLOGIES, INC.,**

                **Defendants.**
_____/

## <u>ORDER</u>

This cause comes before the Court on Defendants L3Harris Technologies, Inc., the Board of Directors of L3Harris Technologies, Inc., and the Investment Committee of L3Harris Technologies, Inc.'s Motion to Dismiss (Docs. 43, 46 (the "**Motion**")),[1] Plaintiffs Robert Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley, and John Karipas's

---

[1] Doc. 43 is a redacted version of the Motion which was filed as an unredacted version under seal at Doc. 46.

response in opposition (Doc. 49), and Defendants' reply thereto (Doc. 53). Upon consideration, the Motion is due to be denied.

## I.    BACKGROUND[2]

This putative class action stems from alleged fiduciary duty violations with respect to a company's employee retirement plan governed by the Employee Retirement Income Security Act of 1974 ("**ERISA**").   Specifically, Plaintiffs Robert J. Stengl, Daniel Will, Ronald F. Kosewicz, Gary K. Colley, Leslie D. Diaz, Amaya Johnson, William A. McKinley and John Karipas ("**Plaintiffs**") are all employees or former employees of Defendant L3Harris Technologies, Inc. ("**Defendant L3**"), a leading defense and aerospace contractor with billions in annual revenue, tens of thousands of employees, and customers across the globe. (Doc. 40, ¶¶ 26–34, 36). As employees of Defendant L3, the Plaintiffs participated in Defendant L3's ERISA-governed retirement savings benefit plan (the "**Plan**"). (*Id.* ¶¶ 26–35).

> Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits. When Congress enacted ERISA it wanted to make sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it. Accordingly,

---

[2]   This account of the facts comes from the Plaintiffs' Amended Complaint. (Doc. 40). The Court accepts the well-pled factual allegations therein as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007). The Court will highlight, however, where the force of some of these claims are weakened by other documents properly under consideration at the motion to dismiss stage.

> ERISA tries to make as certain as possible that pension fund assets will be adequate to meet expected benefits payments.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).

Defendant L3's Plan is a defined contribution plan with a 401(k) feature covering eligible employees of Defendant L3 and some of its subsidiaries; the Plan allows each participant to choose specific amounts to contribute to individual accounts which are invested in selected funds from a menu of options available to the Plan. (Doc. 40, ¶¶ 19, 37, 44, 48–49, 58). Starting on November 23, 2015 through at least June 14, 2022, the Plan had at least $4.5 billion dollars in assets under management. (*Id.* ¶ 16). At the end of 2019, the Plan had over $13.5 billion dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. (*Id.*). The Plan also has a large number of participants: from 2015 to 2019, the Plan's participants with account balances ranged from 47,000 to 76,240. (*Id.* ¶ 17). For comparison, in 2020 there were only 198 defined employer ERISA contribution plans with 15,000 to 19,999 participants with account balances. (*Id.*). For plans with 20,000 to 29,999 participants with account balances there were only 194 of such plans. (*Id.*). For plans with 30,000 to 39,000 participants with account balances, only 90 of those plans existed. (*Id.*). And there were only 123 plans with more than 50,000 participants with account balances in 2020. (*Id.*).

Defendant L3 through its Board of Directors (the "**Defendant Board**") selected and appointed an Investment Committee (the "**Defendant Investment Committee**") and its members to oversee, manage, and achieve

the goals of the Plan as defined in the Plan's Investment Policy Statement (the "**IPS**") and in alignment with ERISA rules and regulations. (*Id.* ¶¶ 37–43, 113). From a 30,000-foot view, this means that the Defendant Investment Committee must determine the appropriateness of the Plan's investment fund offerings, monitor the performance of these investment fund options in absolute and relative terms as compared with their peers, and ensure the Plan incurs no more expenses than is reasonable to achieve the Plan's goals. (*Id.* ¶¶ 37, 58). More specifically, the Plan's IPS requires that the Defendant Investment Committee "establish, and modify, as appropriate, the investment policies for the Plan and the investment objectives and performance goals for the management of Plan investment options, and monitor the performance of investment options against performance criteria;" "select, evaluate, retain, terminate and approve the fees and other retention terms of investment consultants, or other legal, finance or other experts or advisors, including approving, entering into or amending the terms of the related service agreement;" and "establish, suspend, terminate or modify separate investment options and allocate assets into appropriate options of the Plan." (*Id.* ¶ 44).

Contrary to these mandates, though, Plaintiffs allege that in sum total the following actions or omissions by Defendants resulted in the selection and maintenance of several funds with high management, administration, and recordkeeping fees that wasted the assets of the Plan because of unnecessary costs. (*Id.* ¶ 74).

*1.    Excessive Fees*

Plaintiffs allege that many of the Plan's funds had investment management fees in excess of fees for similar funds in similarly sized plans. (*Id.* ¶ 75). In a recent ERISA case regarding similar allegations of fiduciary duty violations the Supreme Court provided background information on investment management fees and their "expense ratios:"

> [I]nvestment options typically offered in retirement plans, such as mutual funds and index funds, often charge a fee for investment management services. Such fees compensate a fund for designing and maintaining the fund's investment portfolio. These fees are usually calculated as a percentage of the assets the plan participant chooses to invest in the fund, which is known as the expense ratio.

*Hughes v. Northwestern University*, 142 S. Ct. 737, 740 (2022). "For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets." (Doc. 40, ¶ 76). Because the expense ratio is deducted from a participant's periodic return for any given fund, the compounded return of any given investment is concomitantly reduced over time. (*Id.*). Plaintiff provides a snapshot comparison of several of the 2021 expense ratios for some Plan Funds chosen by the Defendant Investment Committee and compares them to an Investment Company Institute study[3] of both median and average expense ratios for similarly styled defined contribution ERISA funds:

---

[3]    (Doc. 40, ¶ 79 n.8) (citing *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018*, (July 2021) https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf (last visited Mar. 9, 2023) (hereafter "(the **ICI Study**").

| ICI Median Chart (*Id.* ¶ 79) | | | |
|---|---|---|---|
| **Plan Fund** | **Expense Ratio("ER")** | **Investment Style** | **ICI ER Median** |
| Fid Fr 2015 K | 0.50% | Target-date | 0.40% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.40% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.40% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.40% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.40% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.40% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.40% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.31% |
| T. Rowe SC Stk I | 0.59% | Domestic Equity | 0.31% |
| Dodge & Cox Stock | 0.59% | Domestic Equity | 0.31% |
| Am Growth Fd Am R6 | 0.59% | Domestic Equity | 0.31% |
| Fidelity Balanced K | 0.59% | Non-Target-date Balanced | 0.17% |
| Fidelity Div Int'l K | 0.59% | International Equity | 0.49% |
| Fidelity Div Int'l K6 | 0.59% | International Equity | 0.49% |
| Dodge & Cox Inc. | 0.59% | Domestic Bonds | 0.37% |
| Fid Fr K Inc. | 0.42 % | Target-date | 0.40% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.40% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.40% |

| ICI Average Chart (*Id.* ¶ 80) | | | |
|---|---|---|---|
| **Plan Fund** | **Expense Ratio** | **Investment Style** | **ICI ER Average** |
| Fid Fr 2015 K | 0.50 % | Target-date | 0.41% |
| Fid Fr 2020 K | 0.54 % | Target-date | 0.41% |
| Fid Fr 2025 K | 0.57 % | Target-date | 0.41% |
| Fid Fr 2030 K | 0.61 % | Target-date | 0.41% |
| Fid Fr 2035 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2040 K | 0.64% | Target-date | 0.41% |
| Fid Fr 2045 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2050 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2055 K | 0.64 % | Target-date | 0.41% |
| Fid Fr 2060 K | 0.64 % | Target-date | 0.41% |
| Fid Magellan K | 0.59 % | Domestic Equity | 0.37% |
| T. Rowe SC Stk I | 0.59% | Domestic Equity | 0.37% |
| Dodge & Cox Stock | 0.59% | Domestic Equity | 0.37% |
| Am Growth Fd Am R6 | 0.59% | Domestic Equity | 0.37% |
| Fidelity Balanced K | 0.59% | Non-Target-date Balanced | 0.30% |
| Fidelity Div Int'l K | 0.59% | International Equity | 0.47% |
| Fidelity Div Int'l K6 | 0.59% | International Equity | 0.47% |
| Dodge & Cox Inc. | 0.59% | Domestic Bonds | 0.32% |
| Fid Fr K Inc. | 0.42 % | Target-date | 0.41% |
| Fid Fr 2005 K | 0.44 % | Target-date | 0.41% |
| Fid Fr 2010 K | 0.47 % | Target-date | 0.41% |

##### 2.   *Lower Available Fee Share Classes*

Plaintiffs further allege that several of the Plan's funds with substantial assets were not in the lowest fee share class available to the Plan. (*Id.* ¶ 83). This is allegedly an issue because many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors, but there is no difference between share classes other than cost—the funds hold identical investments and have the same manager. (*Id.* ¶ 84). If institutional share classes are otherwise identical to the other share classes but with lower fees, not switching into the lower cost identical option thus allegedly harms Plan participants' bottom line.  (*Id.* ¶¶ 84, 88–91). Additionally, Plaintiffs allege the Plan qualifies as a jumbo plan by asset size such that the Investment Committee should have leveraged this size to obtain access to otherwise identical share classes with these lower fees. (*Id.* ¶¶ 17–18, 85). Plaintiffs cite the following Plan funds as ones in which identical share classes with lower fees were available but not utilized by the Defendant Investment Committee:

| Fund in the Plan (*Id.* ¶ 86). | ER | Less Expensive Share Class | Lower Cost ER | Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom K | 0.42% | Fidelity Freedom K6 | 0.37% | 13.51% |
| Fidelity Freedom 2005 K | 0.42% | Fidelity Freedom 2005 K6 | 0.37% | 13.51% |
| Fidelity Freedom 2010 K | 0.46% | Fidelity Freedom 2010 K6 | 0.39% | 17.95% |
| Fidelity Freedom 2015 K | 0.49% | Fidelity Freedom 2015 K6 | 0.41% | 19.51% |
| Fidelity Freedom 2020 K | 0.53% | Fidelity Freedom 2020 K6 | 0.43% | 23.26% |
| Fidelity Freedom 2025 K | 0.56% | Fidelity Freedom 2025 K6 | 0.45% | 24.44% |
| Fidelity Freedom 2030 K | 0.60% | Fidelity Freedom 2030 K6 | 0.47% | 27.66% |
| Fidelity Freedom 2035 K | 0.63% | Fidelity Freedom 2035 K6 | 0.49% | 28.57% |
| Fidelity Freedom 2040 K | 0.65% | Fidelity Freedom 2040 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2045 K | 0.65% | Fidelity Freedom 2045 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2050 K | 0.65% | Fidelity Freedom 2050 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2055 K | 0.65% | Fidelity Freedom 2055 K6 | 0.50% | 30.00% |
| Fidelity Freedom 2060 K | 0.65% | Fidelity Freedom 2060 K6 | 0.50% | 30.00% |

### 3. Failure to Investigate Lower Cost Collective Trusts

Plaintiffs further allege that the Defendant Investment Committee failed to investigate the availability of lower cost collective investment trusts ("**CITs**") causing Plan participants to pay higher fees than necessary. (*Id.* ¶¶ 92–99). CITs are allegedly similar to low-cost share classes because some mutual funds are simultaneously available in a CIT format, and although otherwise identical, they frequently cost less as measured by management fees. (*Id.* ¶¶ 92–96). Plaintiffs identify two funds in the Plan which were available as otherwise identical CITs but with lower expense ratios:

| Fund in the Plan (*Id.* ¶ 97). | 2021 ER | CIT Version | 2021 ER |
|---|---|---|---|
| Fidelity Diversified International Fund K11 | 0.69% | Fidelity Diversified International Fund CIT | 0.58% |
| Fidelity Magellan K | 0.68% | Fidelity Magellan CIT | 0.43% |

### 4. Failure to Utilize Modern Portfolio Theory Tools

Plaintiffs further alleged that the Defendant Investment Committee failed to utilize the tools of Modern Portfolio Theory ("**MPT**") in selecting the best investments for the Plan. (*Id.* ¶¶ 101–12). Plaintiffs identify various investment metrics frequently employed by funds managers and allege that these metrics show that several better performing less expensive alternatives were available to the Plan but not chosen by the Plan's fiduciaries. (*Id.* ¶¶ 103–06). In short, Plaintiffs allege that had the Defendant Investment Committee utilized MPT it would have replaced some funds in the Plan with the less expensive but better performing alternatives. (*Id.* ¶¶ 107–12).

5.      *Violations of the Plan's Investment Policy Statement*

Relatedly, Plaintiffs allege the Defendant Investment Committee violated the Plan's IPS by allowing these same funds, which had historically underperformed other similar funds in some cases as measured by some of the highlighted MPT metrics, to remain as part of the Plan. (*Id.* ¶ 113). In other words, although the IPS required the Defendant Investment Committee to "modify, as appropriate, the investment policies for the Plan . . . and monitor the performance of investment options against performance criteria," the Defendant Investment Committee failed to do so by continuing to offer these funds which had underperformed according to certain investment metrics. (*Id.* ¶ 113–15).

6.      *Actively Managed Funds Over Passively Managed Funds*

Plaintiffs allege that Defendants consistently favored actively managed funds when passive funds outperformed them by a significant margin. (*Id.* ¶¶ 116–35). Plaintiffs cite various studies which purport to show that, particularly when the normally higher fees for actively managed funds are considered, various passively managed index funds outperformed many actively managed funds from a period covering 2014 to early 2020. (*Id.* ¶¶ 116–30). Nevertheless, at least 81.48% of the "designated investment alternatives" of the Plan were actively managed. (*Id.* ¶¶ 131–33). Consequently, the Defendant Investment Committee's alleged overreliance on actively managed funds demonstrates a lack of adherence to a prudent monitoring process that should have considered lower-cost passively managed alternatives that seek to achieve the same goal as actively managed

funds and that accordingly costed the Plan and its participants millions of dollars in costs and lost investment gains. (*Id.* ¶¶ 134–35).

### 7. *Insufficient Diversification*

Plaintiffs next allege that the Defendant Investment Committee failed to make enough funds available such that the Plan lacked sufficient diversification options which created unnecessary additional concentration risk for Plan participants. (*Id.* ¶¶ 136–44). Plaintiff focuses on the Plan's availability of growth-focused funds with a blend of different large and mega-cap companies and which contained a large percentage of the Plan's assets. (*Id.* ¶¶ 139–43). These various growth-focused funds allegedly "drifted into one another and also had the tendency to drift down to the same styles in mid cap investments" in terms of the corporations offered within them "[e]ven though the investments claimed to be focused on a specific style." (*Id.* ¶ 142). As a result, Plan participants allegedly took on undue concentration risk. (*Id.* ¶ 144).

### 8. *Excessive Recordkeeping and Administrative Costs*

Finally, Plaintiffs allege that the Defendant Investment Committee improperly tolerated excessive recordkeeping and administrative costs for the Plan.[4] (*Id.* ¶¶ 145–68). The Supreme Court has explained that:

> retirement plans also pay fees for recordkeeping services.
> Recordkeepers help plans track the balances of individual
> accounts, provide regular account statements, and offer

---

[4]  Plaintiffs note in the Amended Complaint that "[t]he term 'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.' Recordkeeping and administrative services fees are one and the same and the terms are used synonymously [in the Amended Complaint.]" (Doc. 40, ¶ 146).

> informational and accessibility services to participants. Like
> investment management fees, recordkeeping fees may be
> calculated as a percentage of the assets for which the
> recordkeeper is responsible; alternatively, these fees may be
> charged at a flat rate per participant account.

*Hughes*, 142 S. Ct. 737, 740 (2022). Specifically, Plaintiffs allege here that the

Plan's recordkeeper, Fidelity, consistently charged "the same relative amount in

recordkeeping and administration fees" to the Plan during the time period in

question but that this fee rate was much higher than that charged to similarly

sized peer plans.[5] (*Id.* ¶¶ 157–58, 165).  Moreover, Plaintiffs allege that some of

these fees were hidden to participants because the Plan used revenue sharing, or

a combination of revenue sharing and a flat fee, to pay for recordkeeping

resulting in recordkeeping fees that were above the market. (*Id.* ¶ 155). Taken in

combination with Plaintiffs' allegation that plans with large numbers of

participants can take advantage of economies of scale by negotiating a lower per-

participant recordkeeping fee as the participants in a plan increase, Plaintiffs aver

that the Defendant Investment Committee failed to either negotiate lower fees

from Fidelity or seek out alternative bids from recordkeepers other than Fidelity

at reasonable intervals.  (*Id.* ¶¶ 151, 155–56). Plaintiffs allege this is particularly

the case because although the recordkeeping fees stayed relatively flat for the

---

[5] Plaintiffs allege that Fidelity has admitted to charging a lower fee to a different plan for services no broader or more valuable those offered to the Plan. (*Id.* ¶ 163). In support, Plaintiffs note that in a recent lawsuit where a multi-billion dollar plan with over fifty thousand participants, just like the Plan here, was sued, the "parties stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020).

Plan, recordkeeping fees for similarly sized plans fell across the recordkeeping industry during the relevant time period. (*Id.* ¶¶ 166–67). In any event, Plaintiffs allege that at the very least the flat recordkeeping fees suggest the Defendant Investment Committee engaged in an insufficient process when reviewing and monitoring the Plan's fees. (*Id.* ¶¶ 157, 168).

### 9.   *Procedural History*

Prior to filing suit in an attempt to obtain further details regarding the Plans' management, the Plaintiffs wrote to Defendant L3 and the Defendant Board on February 25, 2021, requesting, *inter alia*, meeting minutes of the Defendant Investment Committee during the applicable period, but Defendants denied Plaintiffs' request. (*Id.* ¶ 71). Based on the foregoing, Plaintiffs filed this two-count putative class action seeking relief in Count I for the Defendant Investment Committee's alleged breach of its fiduciary duty of prudence causing loss to the Plan and thus Plaintiffs, (*Id.* ¶¶ 169–75), and in Count II for Defendant L3 and the Defendant Board's alleged failure to adequately monitor the fiduciaries they appointed (i.e., the Defendant Investment Committee and its members) causing loss to the Plan and thus to Plaintiffs. (*Id.* ¶¶ 176–82). Defendants now move to dismiss the Amended Complaint for failure to state a claim (Docs. 43, 46). After Plaintiffs' response (Doc. 49) and Defendants' reply (Doc. 53), this matter is ripe for review.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Furthermore, in ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint" and the

attachments thereto which are undisputed and central to the claim. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002); *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926 (11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). In addition, however, the court may consider documents central to a claim whose authenticity is not in dispute as well as matters that are subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (permitting courts to consider documents attached to a motion to dismiss without converting the motion into one for summary judgment, but only if the attached documents are central to the plaintiff's claims and undisputed); *see also* FED. R. EVID. 201 (stating that a court "may judicially notice a fact that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). That said, Courts exercise caution when taking judicial notice because it is "a highly limited process" as it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual

allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

## III. DISCUSSION

A motion to dismiss in the ERISA context is an "important mechanism for weeding out meritless claims" because ERISA "represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424–25 (2014) (internal quotation marks and citations omitted); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (noting that "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times"). The Supreme Court has recognized that Congress wanted to avoid creating "a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). At the same time, because ERISA plaintiffs generally do not have "inside information" regarding the fiduciary's process, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story"—just as with motions to dismiss in other areas of substantive law. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)

(citation omitted); *Hughes*, 142 S. Ct. at 742 (remanding and noting that the lower court must "reevaluate the allegations as a whole" and "in context" by considering whether the plaintiffs "have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in [*Iqbal*] and [*Twombly*]."); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

ERISA's fiduciary duties are "derived from the common law of trusts." *Tibble v. Edison Int'l.*, 575 U.S. 523, 528 (2015). "Certain persons, including those who exercise any authority or control respecting management or disposition of [fund] assets, bear fiduciary responsibility to an ERISA fund." *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) (internal quotations omitted). "The responsibility attaching to fiduciary status has been described as 'the highest known to law.'" *Id.* (quoting *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997)). To state a claim for breach of fiduciary duty under ERISA "the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen*, 835 F.3d at 678 (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)); *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007), *as amended* (Dec. 21, 2007) (laying out that

a breach of fiduciary duty has three elements: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.").[6]

With respect to the second prong, ERISA imposes a duty of prudence, which includes a duty to monitor.[7] 29 U.S.C. § 1104(a)(1)(B); *Tibble*, 575 U.S. at 528–30 (noting a plaintiff may allege that a fiduciary breached his duty of prudence and "continuing duty to monitor . . . by failing to properly monitor investments and remove imprudent ones."). Here, Plaintiffs allege that the Defendant Investment Committee breached its duty of prudence as a fiduciary of the Plan and that Defendant L3 and the Defendant Board breached their derivative duty to monitor their appointees, the Defendant Investment Committee and its members, and their Plan-related actions. (Doc. 40). For the following reasons, the Court finds both claims survive.

### A.    Count I: The Investment Committee's Duty of Prudence

ERISA fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the

---

[6]   Defendants do not challenge their status as fiduciaries with respect to the Plan or that their actions may have caused a loss at this procedural stage, so the Court does not address these elements. (*See* Docs. 43, 46).

[7]   ERISA mandates that those who invest other peoples' retirement money must do so "with the care, skill, prudence, and diligence" that a reasonable professional in the area would use and "defra[y] reasonable expenses of administering the plan[.]" 29 U.S.C. §§ 1104(a)(1)(B), 1103(c)(1). A fiduciary must also "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A). In addition, a fiduciary can also breach his fiduciary duty if he participates knowingly in, conceals, enables, or has knowledge of another fiduciary's breach. *Id.* § 1105(a). Fiduciaries who breach their duties are personally liable to make good to the plan any losses resulting from each breach. *Id.* § 1109(a).

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. '[A] pure heart and an empty head are not enough.'" *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019) (alteration in original) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). "In order to assess the prudence of the fiduciary's actions, they must be evaluated in terms of both procedural regularity and substantive reasonableness." *Allen*, 835 F.3d at 678 (citing *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 680 (7th Cir. 2014)). However, hindsight is potentially misleading, so the focus must be "on a fiduciary's conduct in arriving at [a] . . . decision." *Sweda*, 923 F.3d at 329 (alteration in original) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). To that end, a court should ask "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular [course of action]." *Id.* (quoting *Unisys*, 74 F.3d at 434). At the pleading stage, however, factual allegations do not have to "directly address[] the process by which the [p]lan was managed." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Instead, a plaintiff's allegations are sufficient if a court can reasonably infer that "the process was flawed." *Unisys*, 671 F.3d at 327 (quoting *Braden*, 588 F.3d at 596).[8]

---

[8] The Supreme Court recently discussed the ERISA fiduciary's duty of prudence in *Hughes v.*

With these considerations in mind, the Court now turns to Plaintiffs' allegations. Plaintiffs allege that the totality of the circumstances demonstrate that the Defendant Investment Committee failed to administer the Plan in violation of its fiduciary duty of prudence by selecting funds for the Plan with excessive fees, failing to identify the lowest fee share class available for funds with substantial assets, failing to investigate lower cost alternative collective trusts, not utilizing modern portfolio theory, violating the Plan's Investment Policy Statement, improperly preferencing actively managed funds over passively managed funds, offering insufficiently diversified portfolios, and charging excessive recordkeeping and administrative costs. (Doc. 40, ¶¶ 74–168). Defendants' main rejoinder is that the pleadings do not raise a plausible claim for relief because they are undercut by the pleadings themselves or by documents

---

*Northwestern University*, 142 S. Ct. 737 (2022). There, the plaintiffs alleged that the defendants violated their duty of prudence by offering needlessly expensive investment options and failing to solicit quotes or competitive bids for recordkeeping services. *Id.* at 740. In the case's leadup, the Seventh Circuit had held that the plaintiffs failed to state a claim because the plan offered a mix of low-cost index funds, including the types of funds the plaintiffs wanted; because the plaintiffs' preferred type of investments were available, the Seventh Circuit reasoned, the plaintiffs could not complain about the flaws in the other options. *Id.* The Seventh Circuit further found that the amount of recordkeeping fees paid were within the participants' control, since "'plan participants had options to keep the expense ratios (and, therefore, recordkeeping expenses) low.'" *Id.* at 742 (quoting *Divane v. Northwestern Univ.*, 953 F.3d 980, 991 (7th Cir. 2020)).

The Supreme Court rejected the Seventh Circuit's argument that the availability of plan options eliminated any concern that certain plan options were imprudent. *Id.* The Court explained that the Seventh Circuit's holding "is inconsistent with the context-specific inquiry that ERISA requires and fails to take into account respondents' **duty to monitor all plan investments and remove any imprudent ones**." *Id.* at 740 (citing *Tibble*, 575 U.S. at 530 (2015)) (emphasis added). The Court remanded the case and noted that "[b]ecause the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Id.* at 742 (internal quotation marks, citations, and alterations omitted).

which are either subject to judicial notice or not disputed and central to the claim. (Docs. 43, 46, 53). The Court disagrees.[9] While many of these allegations in isolation are insufficient, taken as a whole and interpreted in the light most favorable to Plaintiffs, it is at least plausible that Defendants breached their fiduciary duty of prudence.

---

[9] While the Court will further address some of these contentions with specificity below, the Court pauses to note that it declines to take judicial notice of the Form 5500s and recordkeeping agreements which Defendant routinely cites. *Huang v. TriNet HR III, Inc.*, No. 8:20-cv-2293, 2022 WL 93571, at *8–9 (M.D. Fl. Jan. 10, 2022) (declining to take judicial notice of various parts of the administrative record and plan-related documents not relied on in the complaint including Form 5500s). First, to do so is not required by Eleventh Circuit precedent as Defendant insinuates. (Doc. 43, p. 3 n.1). True, the Eleventh Circuit counsels judicial notice of these documents at the motion to dismiss stage in securities law cases, but in doing so, the Eleventh Circuit stressed that this special solicitude was granted for the limited purpose of "determining what statements the documents contain and not to prove the truth of the documents' contents" when considering "allegations of material misrepresentations or omissions." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277–78 (11th Cir. 1999). Moreover, the Eleventh Circuit further noted this was proper on a Rule 12(b)(6) motion in light of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 *et seq.* (1999) which, in part, raised the pleading threshold in certain securities cases. *Id.* Despite the overlap in factual subject matter (i.e., investments), ERISA cases are not securities cases, and no such heightened pleading requirement is present in the ERISA context. *See Hughes*, 142 S. Ct. at 742.

Consequently, the Court will not take judicial notice of the Form 5500s and the recordkeeping agreements to which Defendants repeatedly cite. Even if this was a securities law case, it is not clear to the Court that judicial notice would be appropriate at the motion to dismiss stage for the purpose of ascertaining the truth of Plaintiffs' allegations regarding the actual fees charged under the Plan; this is not an instance where the Plaintiffs are alleging fraud or misrepresentation after all. Furthermore, as Defendants tacitly admit by arguing the actual Plan fees were lower than alleged due to various rebates and revenue sharing agreements, (*e.g.*, Doc. 46, p. 6), finding the facts on these issues is not so straightforward as simply looking up various data points in the securities filings. In contrast, in a case repeatedly cited by Defendants, *Matney v. Barrick Gold of N. Am., Inc.*, No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022), the court there took judicial notice of these Form 5500s, and therefore the Court here summarily disagrees with many of the conclusions of the *Barrick Gold* court and will only address them when they are not contingent upon this different approach.

The Court will, however, consider the various documents cited directly in the Amended Complaint, including the ICI study, as they are central to the claims and not reasonably in dispute.

### 1.     Excessive Management Fees

"[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). Nevertheless, "'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (*en banc*) (quoting RESTATEMENT (THIRD) OF TRUSTS, § 90, cmt. b) ("*Tibble II*"). "Beneficiaries subject to higher fees . . . lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks."). As such, while higher fees in comparison with the industry alone are not suspect, their continued presence in an ERISA plan may at some point raise an inference of an imprudent management process. *See Braden*, 488 F.3d at 596–97. With this in mind, the Court analyzes the following three ways which Plaintiffs allege the Plan incurred excessive management expenses due to imprudent management.

### a.     Higher Expense Ratios for Similar Funds

The Court starts by noting that Plaintiffs' list of expense ratio medians and averages from the ICI Study by itself tells the Court little. For one, the ICI Study

itself notes that "[t]his material is intended to provide general information on fees paid by participants in a wide variety of plans to provide insight into average fees across the marketplace. It is not intended for benchmarking the costs of specific plans to the broad averages presented here." *ICI Study*, p. 18.

Moreover, the expense ratios themselves are not the whole story when it comes to fund costs—Plaintiffs themselves allege that the true expenses for a fund are obscured by revenue sharing agreements and rebates which are specific to the fund in question. (Doc. 40, ¶¶ 153–55). Thus, even if the Court accepts Plaintiffs' allegations that the industry-wide comparison of averages and medians to individual Plan funds are matched with apt benchmark comparators, it is unclear if the lower expense ratios cited are truly representative of systematic losses incurred by Plan participants. At the same time, it is not obvious that any revenue sharing or rebates will accrue to the benefit of the Plan participants. *See Braden*, 588 F.3d at 598–99 (noting revenue sharing agreements may not always lead to lower plan costs for the plan participants themselves). Thus, while the ICI Study cannot carry the day by itself even at the motion to dismiss stage, it at least piques the Court's interest that something may be amiss in the management of the Plan due to the contrasting picture it paints with the alleged Plan expense ratios.

### b.   *Lower Available Fee Share Classes and CITs*

The Court agrees with Defendants that ERISA does not "require[] plan fiduciaries to include any particular mix of investment vehicles in their plan."

*Hecker*, 556 F.3d at 586. In this case, however, Plaintiffs' principal allegation is that otherwise identical funds are available in the market with lower fees—either as different fee share classes or CITs—that could have been made available to the Plan either through proper investigation, due diligence, or the leveraging of the Plan's significant size. (Doc. 40, ¶¶ 83–100). This is not the same as requiring a specific fund type's inclusion in the Plan—instead, it plausibly raises an inference that the Defendant Investment Committee did not engage in prudent management of the Plan if, once a fund type is selected, it failed to offer that fund (or its otherwise identical alternative) at a meaningfully lower cost reasonably available in the market. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (finding plausible the allegation that ERISA plan fiduciaries breached their duty of prudence by offering plan participants only retail shares of mutual funds rather than less-expensive institutional shares of the same funds despite its size and leverage). Defendants' main arguments in response contest the factual accuracy of Plaintiffs' allegations, making them inappropriate at this procedural stage.[10]  (*See* Doc. 43, pp. 8–12).

---

[10]   Interpreted in the light most favorable to Plaintiffs, the Court disagrees that the Amended Complaint concedes that the 20 basis points in revenue sharing accrues to the benefit of Plan participants. (Doc. 40, ¶ 155). The thrust of Plaintiffs' allegations appears to be that revenue sharing obscures the true cost of the Plan *to the detriment* of Plan participants, not that the revenue sharing necessarily benefits Plan participants. Defendants other factual protestations are simply inappropriate at this procedural posture. (*See* Doc. 43, pp. 8–12).

c.   *Actively Managed Over Passively Managed*

The Court agrees with the Eighth Circuit when it states that:

> It is true that some analysts think it is better for investors to put their money in . . . a[ passively managed] index fund rather than an actively managed portfolio. But it is not imprudent for a fiduciary to provide both investment options. They have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other.

*Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020). Here, given that Plan participants can choose several passively managed funds, it was not plausibly imprudent for the Defendant Investment Committee to offer a far greater number of actively managed funds; the blend offered in the Plan's menu of funds still allows its participants to construct a portfolio which correlates with their individual risk appetites. (Doc. 40, ¶¶ 116–35).

2.   *Excessive Recordkeeping and Administrative Costs*

Plaintiffs' allegations here are simple: they allege the Defendant Investment Committee tolerated excessively high recordkeeping fees over the time period in question relative to those charged to similarly sized plans. (*Id.* ¶¶ 145–68). Defendants' rebuttal is also simple:  they contend that Plaintiffs' allegations are directly undercut by the terms of the Plan's recordkeeping contract with Fidelity, the Plan's recordkeeper. (Doc. 43, p. 22). The Court's

response is likewise simple: the facts are not properly at issue before the Court at this time.[11]

### 3. *Alternative Measures of Performance: Failure to Utilize MPT*

In a chart, Plaintiffs cite seven different investing statistical measures for both the Plan funds and the comparator funds. (Doc. 40, ¶ 106). The relevance of these cherry-picked categories is not explained beyond conclusory allegations that they are intrinsic to MPT. (*See id.* ¶¶ 101–12). Indeed, with respect to these MPT statistics, sometimes the Plan funds are better performing, sometimes worse, and sometimes about the same. (*See id.*). Moreover, Plaintiffs do not allege or clarify how these statistical measures should work together in a systematic way to show that any Plan investment was imprudent; instead, Plaintiffs focus on the instances where the statistics appear to highlight the Defendant Investment Committee could have made a better choice based on the benefit of hindsight. (*Id.* ¶ 106) ("This data clearly shows that several better performing less expensive alternatives were available to the Plan but not chosen by the Plan's fiduciaries . . . ."). But the Court cannot give credence to backward-looking market results alone. *Unisys*, 74 F.3d at 434 ("the courts measure [ERISA's] 'prudence' requirement according to an objective standard, focusing on

---

[11] The Court disagrees that it can consider the recordkeeping agreement with Fidelity. (Doc. 43, p. 22). For reasons already explained, it has declined to take judicial notice of such documents. *See supra note 9.* And the Plaintiffs did not ever expressly incorporate the agreement in question by reference in their Amended Complaint, unlike in *Tobias v. NVIDIA Corp.*, No. 20-cv-6081, 2021 WL 4148706, at *4 (N.D. Cal. Sept. 13, 2021). In this Court's estimation, to consider these documents and *the disputed inferences* made by Defendants *on the basis of their interpretation of them* would be too procedurally hasty.

a fiduciary's conduct in arriving at an investment decision, not on its results"). What a fiduciary must do is weigh the information that would be relied on by other prudent investors and come to a reasoned judgment, and little about the data by itself suggests the fiduciaries did not do that here. *Hughes*, 142 S. Ct. at 742 (noting "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," so courts must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise"). That said, Plaintiffs are careful to allege the backward-looking data alone is not the issue but instead that the data is indicative of a flawed process. (Doc. 40, ¶¶ 106, 112). The Court agrees in part: alone this data is not enough to push Plaintiffs' claims over the line from the merely possible to the plausible, but it might make the difference in combination with Plaintiffs' other allegations.

### 4.   *Insufficient Diversification*

As part of their duty of prudence, ERISA fiduciaries have a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses . . . ." 29 U.S.C. § 1104(a)(1)(C). To plausibly allege a breach of this duty, however, a complaint must include allegations about the plan's assets "as a whole, not to each investment option." *Schweitzer v. Inv. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 195–96 (5th Cir. 2020). Stated more specifically, a "narrow focus on a few individual funds, rather than the plan as [a] whole, is insufficient to state a claim for lack of diversification." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009). In a defined contribution plan, "fiduciaries . . .

need only provide investment options that enable participants to create diversified portfolios; they need not ensure that participants actually diversify their portfolios." *Schweitzer*, 960 F.3d at 196.

Plaintiffs' allegations are too narrow on this front. Plaintiffs focus the Court's attention on only five funds and ignore the remainder of the Plan menu. (Doc. 40, ¶¶ 136–44). Plaintiffs thus fail to plausibly allege the Defendant Investment Committee acted imprudently due to insufficient diversification options within the Plan.

### 5.   *Violations of the Plan's Investment Policy Statement*

The Court finds Plaintiffs' allegations that the Defendant Investment Committee violated the Plan's IPS to be duplicative of previous allegations. (Doc. 40, ¶¶ 113–15). In other words, although the IPS requires that the Defendant Investment Committee "modify, as appropriate, the investment policies for the Plan . . . and monitor the performance of investment options against performance criteria" and Plaintiffs allege that funds continued to be offered in the Plan despite historically underperforming according to their preferred investment metrics or fund-type blend (passively-managed v. actively managed), this is just another way to infer the relative prudence of the Defendant Investment Committee's decisions based on alleged actions, which the Court has already considered above. (*Id.*).

### 6.     *Totality of the Circumstances*

While the Court doubts that some of the individual allegations here by themselves are enough to state a claim, in sum total the Court finds it plausible that the Defendant Investment Committee's process was flawed. Notably, this is not a case where nothing plus nothing adds up to something; instead, the individual well-pled allegations accumulate as fractional parts of the whole, at some point crossing the plausibility line. This is particularly so in part because the Court agrees with its sister court in a similar ERISA fiduciary duty case which found that the defendants' arguments, which contended that the plaintiffs' claims were "factually incorrect" or relied on "inapt comparators," were inappropriate at the motion to dismiss stage. *TriNet*, 2022 WL 93571, at *8–9. Defendants attempt to distinguish *TriNet* by arguing, "[the case] is distinguishable in almost every respect: it involved a different type of plan (multi-employer instead of single employer), a different procedural posture (a post-administrative appeal), and different arguments." (Doc. 53, pp. 2–3). The Court disagrees because the slightly different procedural posture and multi-employer facts are differences of no moment. The core issue is the same: what weight at this procedural posture should the Court give well-pled allegations regarding a breach of fiduciary duty— a duty the Eleventh Circuit has described as "the highest known to law"—given that Defendant has produced some counter-vailing factual considerations? *Hall*, 334 F.3d at 1013. In the Court's judgment in accord with *TriNet*, most of Defendants' factual contentions are inappropriate on a motion to dismiss such

that Plaintiffs' combined allegations have just enough weight to tip the scales in their favor.

Put another way, while Plaintiffs' claim may ultimately fail, in light of the allegations as a whole it is plausible at this juncture that the Defendant Investment Committee engaged in a flawed process such that it imprudently managed the Plan, and thus, Plaintiffs should enjoy the benefits of discovery to further ascertain whether these allegations have legs, particularly when the Court considers that the Supreme Court has recently reaffirmed that ERISA claims are subject to the same pleading standards as all other claims. *Hughes*, 142 S. Ct. at 742 (noting ERISA claims must be evaluated "as a whole" and "in context" by subjecting them to the same "pleading standard discussed in [*Iqbal*] and [*Twombly*].").

### B.    Count II: L3 and the Board's Duty to Monitor

"A claim for the failure to monitor derives from and depends on an 'underlying breach of fiduciary duty cognizable under ERISA'"—that is, the duty of prudence. *Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-cv-71, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021) (quoting *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003)). The duty to monitor requires that plan fiduciaries "systematic[ally] conside[r] all the investments . . . at regular intervals to ensure that they are appropriate." *Tibble*, 575 U.S. at 529 (quoting A. Hess, G. Bogert, & G. Bogert, *Law of Trusts and Trustees* § 684, at 145–46 (3d ed. 2009)). In short, "a fiduciary is required to conduct a regular review of its

investment"—the fiduciary cannot rely on fulfilling its "duty to exercise prudence in selecting investments at the outset." *Id*. at 528–29.

An appointing fiduciary—that is, a fiduciary who through their role in "appoint[ing] trustees or other fiduciaries" who actively manage ERISA plans—has a specialized duty to monitor that requires reviewing "[a]t reasonable intervals the performance of [the appointed] trustees and other fiduciaries . . . in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards[] and satisfies the needs of the plan." 29 C.F.R. § 2509.75-8, at FR-17; *see also Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465–66 (4th Cir. 1996). Thus, an appointing fiduciary's duty to monitor is no broader than the underlying duty of prudence claim. *Kendall*, 2021 WL 1231415, at *12 (internal quotation marks omitted) (quoting *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017)). Indeed, "the responsibility to monitor appointees" does not expose "the appointing fiduciary to open-ended liability." *Coyne*, 98 F.3d at 1466 n.10; *see also Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992) ("We reemphasize that a party is a fiduciary only as to the activities which bring the person within the definition."). Thus, courts have properly taken a restrictive view of the scope of this duty to monitor appointees and their plan-related activities. *See, e.g., Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (finding board members with power to appoint and remove plan fiduciaries not liable because nothing "put [them] on notice of

possible misadventure by their appointees"). Nevertheless, where a plausible breach of the fiduciary duty of prudence is alleged against the appointees of appointing fiduciaries, courts have routinely found similarly plausible an attendant failure to monitor. *See e.g.*, *Kendall*, 2021 WL 1231415, at *12.

Defendant argues that the failure to monitor claim should fail because it is dependent on the duty of prudence claim and it is supported only by conclusory allegations. (Doc. 46, p. 26). As the court has found Plaintiffs' allegations state a plausible claim of breach of the Defendant Investment Committee's duty of prudence, Plaintiffs' allegations that Defendant L3 and the Defendant Board, as appointing fiduciaries, failed to adequately monitor the performance and investing decisions of the Defendant Investment Committee, the appointed fiduciaries, may survive as well. (Doc. 40, ¶¶ 36–43, 176–82). In other words, it is at least plausible that Defendant L3 and the Defendant Board breached their fiduciary duty by failing to adequately monitor the Defendant Investment Committee in light of the totality of the allegations against all Defendants.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion (Docs. 43, 46) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on March 2, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties